**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 23 2013, 5:48 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

**PATRICK M. RHODES**
Indiana DCS – Marion County
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION    )
OF THE PARENT-CHILD RELATIONSHIP OF:  )
J.S. (Minor Child),                   )
                                      )
    And               )
                                      )
K.G. (Father),                        )
                                      )
    Appellant-Respondent,   )
                                      )
      vs.            )    No. 49A02-1305-JT-438
                                      )
THE INDIANA DEPARTMENT OF CHILD       )
SERVICES,                             )
                                      )
    Appellee-Petitioner.    )
                                      )

And                                              )
                                                 )
CHILD ADVOCATES, INC.,                           )
                                                 )
     Appellee (Guardian ad Litem).               )

---

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1209-JT-37979

---

**December 23, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, K.G. (Father), appeals the trial court's Order terminating his parental rights to his minor child, J.S. (Child).

We affirm.

ISSUE

Father raises one issue on appeal, which we restate as: Whether the Marion County Department of Child Services (DCS) presented sufficient evidence to support the termination of Father's parental rights.

FACTS AND PROCEDURAL HISTORY

Father and T.S. (Mother) are the biological parents of the Child, born on December 10, 2008.[1] Earlier that same year, Father celebrated his eighteenth birthday, and just two months after reaching adulthood, on March 19, 2008, he was arrested and charged with dealing cocaine and resisting law enforcement. Then, on September 11, 2008, Father was arrested for carrying a handgun without a license. On February 3, 2009, Father was sentenced pursuant to a plea agreement. He received fifteen years for dealing cocaine—open to placement and with a ten-year cap on the executed portion, plus two years of probation. He received a one-year concurrent sentence for resisting law enforcement. For the handgun offense, he received a consecutive one-year suspended sentence and one year of probation. At the time of Father's sentencing, the Child was two months old.

Father and Mother have just one child together, but on February 5, 2011, Mother gave birth to the Child's half-sister, J.S. (Sister). The following day, DCS received a report that Mother had abused drugs throughout her pregnancy, and Sister's urine had tested positive for cannabinoids at birth. On February 17, 2011, after conducting interviews and a home visit, DCS filed a petition alleging the Child and her Sister to be Children in Need of Services (CHINS). Initially, the trial court ordered the Child and her Sister to remain in Mother's care, but on March 2, 2011, DCS removed both children from the home because Mother had failed a drug screen. Unsatisfactory background

---

[1] Mother consented to the Child's adoption on December 6, 2012, and she is not a party to this appeal. We will include facts pertaining to Mother as appropriate.

checks prevented DCS from placing the Child in the care of relatives, so DCS arranged for foster care.

On March 16, 2011, the trial court adjudicated the Child to be a CHINS. Father's incarceration inhibited his attendance, but he was represented by counsel who notified the trial court that Father had opted to waive his right to a fact-finding trial. The trial court adopted a permanency plan of reunification and ordered Father "to participate [in] and complete homebased counseling and parenting assessment and follow all recommendations when he is released from jail." (DCS Exh. p. 31). Specifically, the trial court directed Father, among other things, to:

> * . . . Notify the caseworker of changes in address, household composition or telephone number within five (5) days of said change.
>
> * * * *
> * . . . To the extent that you are ordered to engage in programs or other orders, you are required to enroll in that program within thirty days and participate in the program as scheduled by that program without del[ay] or missed appointments. To the extent that you were required to obtain an assessment, you shall arrange to complete that assessment within thirty days.
> * . . . Execute any current up to date releases of information necessary to monitor compliance with the terms of this order.
>
> * * * *
> * . . . Contact the caseworker every week to allow the caseworker to monitor compliance with this [c]ourt's orders in this case. The contact may be in person, by letter or by telephone.
> * . . . Secure and maintain a legal and stable source of income, including public assistance, adequate to support all the household members as well as the [C]hild.
> * . . . Obtain and maintain suitable housing with adequate bedding, functional utilities, a supply of food and food preparation facilities and that the home remain home (*sic*) and safe for all residing within.

* * * *

\* . . . [E]stablish paternity as to [the Child].

(DCS Exh. pp. 34-35).

On June 24, 2011, the trial court authorized the Child's placement with Mother for an in-home trial visit. The Child and her Sister remained on "in-home CHINS" status until March 5, 2012, when the trial court ordered their removal following Mother's cocaine relapse. DCS placed the Child, together with her Sister, in foster care. At the end of March of 2012, Father was permitted to participate in the Department of Correction's work release program, of which Father failed to notify DCS. On April 3, 2012, DCS placed the Child and her Sister in the care of the Child's paternal grandmother (Grandmother). After six days, Grandmother "refused to keep them in her home any longer" and returned the Child and her Sister "to DCS in the middle of the night." (DCS Exh. p. 54; Transcript p. 89). DCS transferred the children to foster care. During the Child's brief stay with Grandmother, and unbeknownst to DCS, Father visited the Child twice. Father's two visits in April of 2012 are the only face-to-face meetings Father and the Child have ever had.

On July 25, 2012, the trial court conducted a permanency hearing, during which Father's counsel informed the trial court that Father had escaped from custody while out on work release. Father was still a fugitive on September 26, 2012 when the trial court approved modification of the Child's permanency plan from reunification to adoption. On September 27, 2012, DCS filed a petition to terminate Father's parental rights. In October of 2012, Father surrendered himself to the Marion County Jail, where he

remained until February 25, 2013, when he was released from incarceration and ordered to participate in a re-entry program. The following month—two weeks prior to the termination hearing—Father attempted to contact DCS about visitation. On March 25, 2013, the trial court conducted the termination hearing and, on April 22, 2013, ordered the termination of Father's parental rights.

Father now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

Father claims that the trial court's termination of his parental rights was not supported by clear and convincing evidence. In reviewing the termination of parental rights, this court does not reweigh evidence or judge the credibility of witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We will consider only the evidence, and any reasonable inferences to be drawn therefrom, most favorable to the trial court's judgment. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Our standard of review is two-tiered: first, we must determine whether the evidence supports the trial court's findings; and second, we must determine whether the findings support the trial court's judgment. *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*. Because the trial court heard the evidence and had the opportunity to judge the witnesses' credibility, we will uphold its judgment unless it is clearly erroneous. *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234-35 (Ind. 1992). We will find the

trial court's judgment is clearly erroneous if the findings do not support the conclusions, or if the conclusions do not support the judgment. *Bester*, 839 N.E.2d at 147.

It is "perhaps the oldest of the fundamental liberty interests" that parents be able to raise their children without undue governmental interference. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Bester*, 839 N.E.2d at 147). Accordingly, the Fourteenth Amendment to the United States Constitution protects the rights of parents to have control over the care and custody of their children. *Id.* The involuntary termination of parental rights permanently severs all ties between the parent and child and, therefore, is the most extreme sanction a court can impose. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Although termination is designated as a last resort, after all other reasonable efforts have failed, it is an appropriate remedy when the parents are unable or unwilling to execute their parental responsibilities. *Id.* When the emotional and physical development of a child is threatened, the constitutional rights of the parent become subservient to the necessity of protecting the child. *Lang*, 861 N.E.2d at 371.

In Indiana, for a trial court to involuntarily terminate parental rights, the law mandates that DCS prove, by clear and convincing evidence,

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

7

Ind. Code § 31-35-2-4(b)(2)(B)-(D). In this case, Father asserts that the evidence does not support the trial court's finding that termination of his parental rights is in the Child's best interests.[2] The trial court found that termination would "allow [the Child] to begin a normal childhood, with her [S]ister, in a permanent and stable environment where her needs will continue to be met. [Father] is not in a position to offer [the Child] permanency." (Appellant's App. p. 21). Father, however, contends that "he has never been given a chance to parent" and "wants to be reunited with his daughter." (Appellant's Br. p. 10).

In ascertaining the best interests of a child, a trial court must consider the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. Here, the record demonstrates that Father has never been capable of providing a stable home for the Child. He was incarcerated for a majority of the Child's life and has only seen her on two occasions. Father has never provided any support, financial or otherwise, for the Child's care. Father lives with Grandmother, is unemployed, and has a

---

[2] Father does not challenge the sufficiency of the evidence supporting the trial court's findings that there is a reasonable probability that the conditions necessitating the Child's removal will not be remedied, that the continuation of the parent-child relationship poses a threat to the Child's well-being, and that DCS has established a satisfactory plan for the care and treatment of the Child. *See* I.C. § 31-35-2-4(b)(2).

suspended driver's license. With the exception of two months spent working at a grocery store, he has never sustained any type of gainful employment. Father is completely dependent on Grandmother for financial support and relies on Grandmother and his girlfriend for transportation. Father testified that Grandmother would support the Child and that there is an extra bedroom available for her, but, as history verifies, Grandmother's charity is not guaranteed. In DCS's previous attempt to place the Child with Grandmother, Grandmother refused to keep the Child for even a full week before she was, once again, uprooted and returned to foster care.

Our court has long held that the trial court should not delay terminating parental rights until the "child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired." *Id.* at 372. Here, there is "no guarantee that [Father] will be a suitable parent" or that he will ever be able to provide for his children, but the Child needs stability and permanency now. *Id.* at 374 (citing *In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004)). "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d at 1265. The Child is currently in her sixth placement and requires therapy to cope with the instability in her life. Both the DCS case manager and guardian *ad litem* stated that the Child has bonded with her foster mother and finally feels secure in her placement. The Child's guardian *ad litem* testified that it would be in the best interests of the Child "to be adopted along with her [S]ister who [has] been with her . . . the whole time. . . . And that would be what's normal for her." (Tr. p. 118). The guardian *ad litem* further stated that

9

the best interests of the Child would not be served by providing Father with additional time to complete his services because

> [t]hroughout the placement there's [been] other people [that] she's mentioned but [Father has] never been one of them[,] so it lets me know that she doesn't really know him and so it would be just like another removal, to remove her from a place that she considers home . . . for her to have to go through a process of trying to get to know someone.

(Tr. p. 119). It is well-established that "that the testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests." *In re A.I.*, 825 N.E.2d at 811.

Father argues that he is "ready to handle [his] responsibilities as a man," as demonstrated by the fact that he established paternity, completed a parenting class, and earned his GED while incarcerated. (Tr. p. 71). Also, while escaped from work release, Father enrolled in a welding course at Ivy Tech, and he testified that he is drug free and has maintained a search for employment. The record does not, however, reflect the actions of a parent willing to accept responsibility. Father never complied with his court-ordered services, and his first attempt to contact DCS about visitation occurred just two weeks prior to the termination hearing.[3] Furthermore, Father has a hefty history of juvenile offenses and was arrested twice within months of becoming an adult. The Department of Correction entrusted Father with the freedom that accompanies

---

[3] Father testified that, although he "received a lot of mail" from DCS and completed a questionnaire, he believed the CHINS proceedings applied only to Mother, his public defender never communicated with him, and he did not know that he was required to contact DCS or complete services. (Tr. pp. 28-29). Because Father has not argued that DCS failed to provide the requisite notice or that he has otherwise been deprived of due process, we do not address his assertions regarding his lack of knowledge of the case.

participation in work release, but Father fled and spent three months on the run. Parents on work release are able to participate in DCS services, but Father never attended any court proceedings or communicated with DCS in an effort to visit the Child or arrange for services. Accordingly, the totality of the evidence clearly establishes that termination of Father's parental rights is in the Child's best interests.

## CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's finding that termination is in the Child's best interests; therefore, the trial court did not err in terminating Father's parental rights to the Child.

Affirmed.

MAY, J. and VAIDIK, J. concur

11