Douglas CASTRO, Appellant–Respondent,

v.

STATE of Indiana OFFICE OF FAMILY AND CHILDREN, Appellee–Petitioner.

No. 53A01–0507–JV–00308.

Court of Appeals of Indiana.

Feb. 13, 2006.

Transfer Denied May 11, 2006.

Michael J. Spencer, Deputy Public Defender, Bloomington, for Appellant.

Maryanne Pelic, Bunger & Robertson, Bloomington, for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Douglas Castro appeals the trial court's order terminating his parental rights to his daughter, T.P. Specifically, Castro argues that there is insufficient evidence to support the trial court's decision and that he was denied due process of law during the CHINS/termination proceeding. Castro also contends that Indiana's entire CHINS/termination scheme is unconstitutional in that it deprives all parents of due process of law. Finding that the trial court's decision to terminate Castro's parental rights was supported by clear and convincing evidence and that the requirements of the Due Process Clause were satisfied, we affirm the termination of Castro's parental rights. We also hold that Indiana's CHINS/termination scheme does not violate the Due Process Clause.

### Facts and Procedural History

Castro has been incarcerated for more than ten years and for the entire lifetime of his daughter, T.P., who was born on May 6, 1996. In T.P.'s first eighteen months, Castro held her once and saw her approximately ten other times while he was being held in the Monroe County Jail. On March 16, 1998, Castro was sentenced to an executed prison term of forty years after he pled guilty to one count of criminal deviate conduct as a Class B felony and six counts of burglary as Class B felonies. Pursuant to the terms of his sentencing order, Castro became eligible in September 2005 to petition for a modification of his sentence.[1] As it stands, because of good time credit and the completion of several programs while in prison, Castro is scheduled for release in May 2012. Since being transferred to the Department of Correction, Castro's only contact with T.P. has been by letter.

The Monroe County Office of Family and Children ("MCOFC") took T.P. from her mother, Alissa Pemberton Dyer ("Alissa"), on August 7, 2003, after T.P. was found playing unsupervised in her trailer park with her young brothers. On October 27, 2003, Castro and Alissa admitted that T.P. was a Child in Need of Services ("CHINS"), and the trial court entered judgment. Then, on September 30, 2004, the MCOFC filed a petition for the termination of the parent-child relationship between Castro and Alissa and T.P.

On June 20, 2005, the trial court issued an order in which it made several findings regarding Castro. As to Castro's incarceration, the court found:

> 32. Douglas D. Castro has compiled a remarkably good institutional record during his incarceration. He has never had a disciplinary infraction and has never lost credit time. He obtained an Associate in Arts degree from Ball State University on May 5, 2001, and Bachelor of General Studies degree from Ball State University on May 8, 2004. He completed a program in Anger Manage-

---

1. While Castro says he was eligible to petition for modification of his sentence in September 2005, we note that Castro filed his Appellant's Brief on October 27, 2005, and in it there is no indication of whether his sentence has been modified or whether he even filed a petition. This leads us to the conclusion that he is still incarcerated. In any event, the possibility that Castro will be released early, or has already been released, does not affect our disposition of this appeal.

ment at the Indiana State Prison in Michigan City on May 31, 2000 and completed a course in Parenting at the Westville Correctional Facility on April 26, 2005. He completed a 1500–hour course in barbering and is studying as an instructor. He has also completed biohazard training and does HAZMAT cleanups at the factories on the prison grounds. He has received commendations and excellent Offender Evaluation and Performance Reports from the staff. His security level classification is two (2) out of a possible four (4) (the most restrictive).

Appellant's App. p. 36.

However, as to Castro's relationship with T.P., the trial court's findings were not as positive:

33. Douglas D. Castro has never provided care or support for [T.P.]. He has held her only once, and that was a contact visit that was allowed while the father was in custody in the Monroe County Jail. Alissa took [T.P.] to the Monroe County Jail to visit [Castro] about ten (10) times between [T.P.'s] birth on May 6, 1996 and the time [T.P.] was eighteen (18) months old. [Castro] has written [T.P.] four letters which have been conveyed to her through Sandy Tucker, [T.P.'s] therapist at Family Solutions. He may have written more letters that he sent to Alissa to share with [T.P.]. [T.P.] has enjoyed the letters. She knows her father is in prison. [T.P.] has met her father's parents, siblings and niece and nephew when they traveled to Monroe County, Indiana to meet her. She knows those people are a part of her family.

34. Douglas D. Castro would like to care for [T.P.]. He does not have the present ability to care for her. He is in prison. He has never been a part of her life except as set out above. Even given

the excellent institutional record he has amassed, it would be sheer speculation for this court to conclude that his forty (40) year executed prison sentence will be modified in the near future; that he will be released from prison; and that if he is released from prison he will have the ability to support and properly care for a nine (9) year old child he has never known.

35. Because [Castro] is in prison serving an executed forty (40) year sentence the [MCOFC] has not been able to provide services that would make it possible for [Castro] to care for [T.P.].

* * * *

37. The Court finds and concludes that [Castro] is incarcerated and incapable of caring for [T.P.].

*Id.* at 36–37.

Finally, as to T.P.'s current placement, the trial court noted that the court-appointed special advocate ("CASA") assigned to T.P.'s case reported that T.P. is "really doing well" in her present foster care placement and that her current foster parents are considering adopting her. *Id.* at 37. Based on the foregoing findings and others, the court made the following relevant conclusions regarding Castro:

39. It was established by clear and convincing evidence there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied.... [Castro] is unable to care for [T.P.]. He is in prison. However, [Castro] has never cared for [T.P.]. He has provided no support, and has never had any contact with [T.P.] except as set out in this order. Even if he was not incarcerated, the Court concludes that he would not be able to care for [T.P.].

\* \* \* \*

42. It was established by clear and convincing evidence that termination is in the best interest of [T.P.].

*Id.* at 38. The court then ordered that Castro's parental rights to T.P. be terminated. Castro now appeals.

## Discussion and Decision

Castro raises three issues on appeal. First, he argues that the trial court erred by finding that the MCOFC presented clear and convincing evidence that (a) there is a reasonable probability that the conditions that resulted in T.P.'s removal will not be remedied or (b) termination of his parental rights is in T.P.'s best interests. Second, Castro contends that errors made by the MCOFC throughout the CHINS/termination process deprived him of his due process rights. Third, Castro asserts that the entire CHINS/termination process, from the State's initial intervention to the trial court proceedings and up through our analysis on appeal, violates the due process rights of parents. We address each argument in turn.

## I. Termination of Castro's Parental Rights

Castro first argues that the trial court erred when it terminated his parental rights to T.P. We will not set aside a trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. *In re J.W.*, 779 N.E.2d 954, 959 (Ind.Ct.App.2002), *trans. denied.* Where, as here, the trial court enters findings of fact, a two-tiered standard of review will be employed. *Id.* First, we determine whether the evidence supports the findings. *Id.* Next, we determine whether the findings support the judgment. *Id.* "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Bester v. Lake County Office of Family and Children,* 839 N.E.2d 143, 147 (Ind.2005) (quoting *In re R.J.,* 829 N.E.2d 1032, 1035 (Ind.Ct.App.2005)). When reviewing a termination of parental rights, this Court neither reweighs the evidence nor judges the credibility of witnesses. *Id.* Rather, we will consider only the evidence and reasonable inferences therefrom which are most favorable to the judgment. *Id.*

 We begin by emphasizing that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re E.S.,* 762 N.E.2d 1287, 1290 (Ind.Ct.App.2002). Rather, when the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id.* This Court has stated:

> The involuntary termination of parental rights is an extreme measure that terminates all rights of the parent to his or her child and is designed to be used only as a last resort when all other reasonable efforts have failed. The Fourteenth Amendment to the United States Constitution provides parents with the rights to establish a home and raise their children. However, the law allows for termination of those rights when the parties are unable or unwilling to meet their responsibility as parents. This policy balances the constitutional rights of the parents to the care and custody of their children with the State's limited authority to interfere with these rights. Because the ultimate purpose of the law is to protect the child, the parent-child relationship must give way when it is no longer in the child's best interest to maintain the relationship.

*M.H.C. v. Hill,* 750 N.E.2d 872, 875 (Ind. Ct.App.2001) (citations omitted). In sum, the purpose of terminating parental rights is not to punish parents but to protect children. *In re A.I.,* 825 N.E.2d 798, 805 (Ind.Ct.App.2005), *trans. denied.*

■ Indiana Code § 31–35–2–4(b)(2) provides that a petition to terminate parental rights must allege, in pertinent part, that:

> (B) there is a reasonable probability that:
>
>> (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied;
>>
>> or
>>
>> (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
>
> (C) termination is in the best interests of the child; and
>
> (D) there is a satisfactory plan for the care and treatment of the child.

The petitioner must prove each of these elements by clear and convincing evidence. Ind.Code § 31–37–14–2; *see also In re D.L.,* 814 N.E.2d 1022, 1026 (Ind.Ct.App. 2004), *trans. denied.* Because subsection (b)(2)(B) is written in the disjunctive, however, the trial court need only find one of the two elements by clear and convincing evidence. *Bester,* 839 N.E.2d at 148 n. 5.

■ Castro argues that the trial court's decision to terminate his parental rights to T.P. is clearly erroneous because the MCOFC failed to present clear and convincing evidence that there is a reasonable probability that the conditions leading to T.P.'s removal will not be remedied. He also asserts that the trial court erred in finding that termination of his parental rights is in T.P.'s best interests. We disagree with both contentions.[2]

Castro argues that in finding that there is a reasonable probability that the conditions resulting in T.P.'s removal will not be remedied, the trial court ignored the facts that he was eligible to petition for a modification of his sentence in 2005 and that he has improved himself while incarcerated by, among other things, completing a parenting course. "To determine whether there is a reasonable probability that the conditions which resulted in the removal of the children will not be remedied, the trial court should judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re M.M.,* 733 N.E.2d 6, 13 (Ind.Ct.App. 2000). The trial court must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id.*

In part, the "condition" that resulted in T.P.'s removal or the "reason" for her placement in a new home is Castro's incarceration and consequent inability to provide "food, shelter, clothing, medical care, education or supervision for [T.P.]." Appellee's Br. p. 6. On one hand, it is true that because of his incarceration, Castro did not, and in fact *could* not, contribute directly to the physical conditions that led to T.P.'s removal from Alissa's home. However, for the same reason Castro was equally unable to remedy those conditions.

**2.** Castro also claims in his brief that the MCOFC failed to prove by clear and convincing evidence that there is a satisfactory plan for the care and treatment of T.P. However, Castro failed to develop a cogent argument on this issue and has therefore waived it. *See* Ind. Appellate Rule 46(a)(8)(A). Waiver notwithstanding, the MCOFC's plan for T.P. is adoption, and adoption is generally a satisfactory plan. *See In re C.C.,* 788 N.E.2d 847, 856 (Ind.Ct.App.2003), *trans. denied; In re A.K.,* 755 N.E.2d 1090, 1098 (Ind.Ct.App.2001).

Furthermore, if, as projected, Castro will not be released until 2012, he is obviously helpless to remedy those conditions within a meaningful timeframe. And even if his sentence is modified and he will be released earlier than 2012, or has already been released, he was still incarcerated for at least ten years and has at least seven serious felony convictions on his record. Under these circumstances, Castro will have difficulty establishing a stable life for himself, let alone for T.P. Therefore, while we applaud Castro's efforts to improve himself during his time in prison, we cannot say that the trial court committed clear error when it found that there is a reasonable probability that the conditions leading to T.P.'s removal from Castro will not be remedied.[3]

Castro also contends that the MCOFC failed to present clear and convincing evidence that termination of the parent-child relationship is in T.P.'s best interests. A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests. *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind.Ct. App.2002), *trans. denied.* In other words, "[a]lthough parental rights have a constitutional dimension, the law allows for their termination when parties are *unable* or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind.Ct.App.2004) (emphasis added).

Because he has been incarcerated since before T.P.'s birth, Castro has an historical inability to provide adequate housing, stability and supervision for her. Likewise, Castro's continued incarceration at the time of the June 2005 termination hearing is strong evidence of his current inability to provide the same.[4]

Keeping in mind that the purpose of terminating parental rights is not to punish parents but to protect children, *In re A.I.*, 825 N.E.2d at 805, several other factors weigh in favor of the trial court's conclusion that the termination of Castro's parental rights is in T.P.'s best interests: (1) T.P. is in need of stability and permanency now; (2) T.P. is doing well in her current placement; and (3) there is no guarantee that Castro will be a suitable parent once he is released or that he would even obtain custody. *See In re S.P.H.*, 806 N.E.2d at 883 (holding that the needs of the children are too substantial to force them to wait while determining if their incarcerated father would be able to be a parent for them).

As the MCOFC stresses, this Court has recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Matter of A.C.B.*, 598 N.E.2d 570, 572 (Ind.Ct.App.1992). Castro was incarcerated when T.P. was born, when T.P. was taken into custody by the MCOFC, when the termination hearing

---

**3.** Castro notes in his brief that the MCOFC did not provide him with any services. We agree with the trial court that this has more to do with the fact that Castro was incarcerated than with any wrongdoing by the MCOFC. *See* Appellant's App. p. 37; *see also* Section II, below.

**4.** As noted above, Castro was eligible in September 2005 to petition for a modification of his sentence. Again, even assuming that Cas-

tro filed such a petition, the possibility that he could be released earlier than May 2012 does not alter our conclusion. *See In re M.B.*, 666 N.E.2d 73, 79 (Ind.Ct.App.1996) ("The testimony clearly established that postponing reunification with Bailey would be seriously detrimental to the children's development, *especially since Bailey's early release from prison is not guaranteed.*") (emphasis added), *trans. denied.*

was held, and, it appears, is still incarcerated today. T.P. is now almost ten years old and has lived in foster care since the age of seven. Even assuming that Castro will eventually develop into a suitable parent, we must ask how much longer T.P. should have to wait to enjoy the permanency that is essential to her development and overall well-being. The trial court's conclusion that termination of Castro's parental rights is in T.P.'s best interests is supported by clear and convincing evidence and therefore is not clearly erroneous.

## II. Castro's Due Process Rights

Castro next alleges that he was denied due process of law throughout the CHINS/termination proceeding. Specifically, he argues that certain actions taken by the MCOFC did not satisfy statutory requirements and that he had the right to have necessary services provided to him. The MCOFC responds that it did everything it could to the best of its ability given the resources it has and given the fact that Castro is incarcerated. As such, the MCOFC contends, the requirements of due process were met. We agree.

■ The State must satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution when it seeks to terminate the parent-child relationship. *In re S.P.H.*, 806 N.E.2d at 878. "Due process requires notice, an opportunity to be heard, and an opportunity to confront witnesses." *In re M.L.K.*, 751 N.E.2d 293, 295–96 (Ind.Ct.App.2001). Before an action affecting a party's interest in life, liberty, or property protected by the Due Process Clause proceeds, the State, at a minimum, must provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Id.* at 296

(citing *Yoder v. Elkhart County Auditor,* 632 N.E.2d 369, 372 (Ind.Ct.App.1994)). "[P]rocedural irregularities in a CHINS proceedings [sic] may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *A.P. v. Porter County Office of Family & Children,* 734 N.E.2d 1107, 1112–13 (Ind.Ct. App.2000), *reh'g denied, trans. denied.*

Castro argues that he was not afforded due process of law in that: (1) he was not informed until October 27, 2003, of T.P.'s August 7, 2003, removal from Alissa's home; (2) he was not able to participate in negotiating a case plan for the family as envisioned by Indiana Code § 31–34–15–2; (3) he did not receive a copy of the initial case plan within ten (10) days as required by Indiana Code § 31–34–15–3; (4) the MCOFC did not file its first case plan within sixty (60) days after T.P.'s first placement as required by Indiana Code § 31–34–15–2; and (5) the "confusing recommendations" in the case plans make it difficult to comprehend the MCOFC's intentions.

■ Castro first contends that he should have been informed earlier of T.P.'s removal from Alissa's home. However, he fails to explain why the MCOFC's failure to notify him more quickly amounts to a deprivation of due process or how the result of the CHINS/termination proceeding may have been different had he known earlier about T.P.'s removal. Indeed, because Castro was incarcerated, there is little, if anything, that he could have done to change the situation. Given the government's strong interest in removing T.P. from an unsuitable home and the fact that Alissa was quickly notified of T.P.'s removal, we cannot say that the MCOFC's actions in this regard constitute a deprivation of due process.

■ Castro also asserts that the MCOFC's failure to strictly follow certain statutory procedures relating to case plans deprived him of due process. We disagree. First, even though Castro was not able to participate in person in the formulation of the case plans, he was able to communicate by letter with Kathleen Durkel, the MCOFC case manager. Importantly, Castro does not allege that he was not *allowed* to participate in case plan negotiations; rather, he was simply *unable* to do so because of his incarceration.

Second, while the MCOFC failed to comply with the technical time restrictions regarding case plans, those case plans were completed, and Castro did eventually receive copies of all of them. It is important to emphasize that two important purposes of a case plan are to notify parents of conduct that could lead to the termination of parental rights and to inform parents of the steps they need to take in order to facilitate reunification with the child. *See In re S.P.H.*, 806 N.E.2d at 879. Castro does not claim that he did not receive the case plans and so was unaware of this information. Again, while technically in violation of the statutes, we cannot say that the MCOFC's failure to adhere to the time requirements regarding case plans deprived Castro of due process. *Cf. A.P.*, 734 N.E.2d at 1114 (complete failure to provide case plans to parents cited as one of several procedural irregularities that combined to constitute a deprivation of due process).

■ Finally, Castro contends that he was denied due process because the three case plans contained certain inconsisten-

cies with regard to the consequences of his and Alissa's compliance or noncompliance with the requirements established by the MCOFC. For example, while the first case plan said that if the parents met the terms of the plan, the county may recommend "Reunification with family preservation and support," Appellant's App. p. 40, the second case plan said that similar compliance would lead to a recommendation that adoption be finalized. *Id.* at 46. We acknowledge that the two case plans were inconsistent on this point and that the second case plan contained errors.[5] However, both the first and second case plans included the same terms regarding Castro: submission to a psychological evaluation after his release. *Id.* at 42, 48. Because the conditions required of Castro in the case plans were clear, we cannot say that any confusion arising from the inconsistencies in those plans deprived Castro of due process.

Significantly, Castro does not claim that he did not receive notice of any court hearings. He does not claim that he was prevented from attending any court hearings or that he was not afforded an opportunity to be heard at those hearings. Finally, he does not claim that he did not have an opportunity to confront the witnesses against him. And while "procedural irregularities in a CHINS proceedings [sic] may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights," *A.P.*, 734 N.E.2d at 1112–13, this was not such a case. Indeed, any procedural irregularities that occurred in this case are largely attributable to the fact that Castro has been incarcerated

5. The second case plan stated that compliance by the parents with the terms of the plan may lead to a recommendation that adoption be finalized, while noncompliance may lead to a recommendation of continued wardship. It seems that the consequences of noncompli-

ance are more favorable to the parents than the consequences of compliance. We assume that this anomaly was the result of a clerical error. Regardless, it does not affect our disposition of this appeal.

throughout the proceedings. And we cannot say that those flaws that are not attributable to Castro's incarceration rise to the level of a deprivation of Castro's due process rights.

■ Next, Castro asserts that he was denied due process because the MCOFC failed to provide services to him. Castro correctly notes that a county office of family and children is generally required to "make reasonable efforts to preserve and unify families." Ind.Code § 31–34–21–5.5. However, the trial court made the following finding in terminating Castro's parental rights: "Because Douglas, is in prison serving an executed forty (40) year sentence the [MCOFC] has not been able to provide services that would make it possible for [Castro] to care for [T.P.]." Appellant's App. p. 37. Because of Castro's incarceration, not only was the MCOFC unable to offer services to him, but it was unable to even fully evaluate him to determine what services are necessary. MCOFC's failure to offer services to Castro does not constitute a deprivation of his due process rights.

### III. Constitutionality of the CHINS/Termination Process

■ Castro argues that Indiana's statutory termination scheme deprives parents of due process of law because it only requires the State to prove its allegations by clear and convincing evidence. *See* I.C. § 31–37–14–2. Castro contends that the "beyond a reasonable doubt" standard applied in criminal proceedings should be used because of the potentially serious consequences of a termination proceeding. We cannot agree. The United States Supreme Court stated in *Santosky v. Kramer*:

A majority of the States have concluded that a 'clear and convincing' standard of proof strikes a fair balance between the rights of the natural parents and the State's legitimate concerns. We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process. We further hold that determination of the precise burden equal to or greater than that standard is a matter of state law properly left to state legislatures and state courts.

455 U.S. 745, 769–70, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *see also Ellis v. Knox County Dep't of Pub. Welfare*, 433 N.E.2d 847, 848 (Ind.Ct.App.1982) (holding that in light of *Santosky*, Indiana's former "preponderance of the evidence" standard in termination proceedings was unconstitutional). Our General Assembly has adopted the clear and convincing standard for termination cases, the Indiana Supreme Court has consistently applied it, and the United States Supreme Court has held that such a standard satisfies the requirements of due process. Therefore, we reject Castro's argument.

■ Castro also contends that 42 U.S.C. § 675(5)(E) conflicts with the "fundamental right of child-rearing." Appellant's Br. p. 18. That federal statutory provision provides that, as a condition of receiving federal funding, a State must file a petition to terminate the parental rights of the parents of a child who has been in foster care under the responsibility of the State for fifteen (15) of the most recent twenty-two (22) months. In essence, Castro is challenging Indiana Code § 31–35–2–4.5(a)(2)(B), where the requirements of 42 U.S.C. § 675(5)(E) have been codified in Indiana. This Court has already addressed the constitutionality of this provision and held as follows:

The Due Process Clause does not empower the judiciary to sit as a superleg-

islature to weigh the wisdom of legislation. The legislation must merely bear a rational relation to a legitimate governmental purpose. The Indiana statute seeks to facilitate adoptions, instead of endless foster care placements, for children placed outside their parental homes for an extended period of time. Accordingly, it sets a fifteen-month benchmark after which the judicial system becomes involved by the automatic filing of a petition to terminate parental rights. Although the filing of such a petition is certainly not a matter to be taken lightly, it does bear a rational relation to the State's very legitimate interest in promoting adoptions of children who have been removed from their parental homes for extended periods of time. The Indiana statute ... does not violate the Due Process Clause.

*Phelps v. Sybinsky,* 736 N.E.2d 809, 818 (Ind.Ct.App.2000) (internal citations omitted), *trans. denied.* We agree with the *Phelps* Court and reaffirm its holding that Indiana Code § 31–35–2–4.5(a)(2)(B) does not violate the Due Process Clause.

### Conclusion

The MCOFC presented clear and convincing evidence that there is a reasonable probability that the conditions leading to T.P.'s removal from Castro will not be remedied and that termination of Castro's parental rights is in T.P.'s best interests. Furthermore, Castro was not denied due process of law during the CHINS/termination proceeding. Finally, Indiana's CHINS/termination scheme does not violate the Due Process Clause.

Affirmed.

ROBB, J., and MATHIAS, J., concur.