## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Feb 26 2015, 10:07 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Thomas G. Krochta
Evansville, Indiana

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Miller
Graduate Law Clerk
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of K.E., Child,

And

J.E. (Father) and S.S. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 26, 2015

Court of Appeals Case No. 82A04-1407-JT-320

Appeal from the Vanderburgh Superior Court.

The Honorable Brett J. Niemeier, Judge.

The Honorable Renee Allen Ferguson, Magistrate.

Cause No. 82D01-1402-JT-18

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Respondents, J.E. (Father) and S.S. (Mother) (collectively, Parents), appeal the trial court's Order terminating their parental rights to their minor child, K.E. (Child).

We affirm.

## ISSUES

Parents raise two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion in denying Father's motion for a continuance; and

(2) Whether the Indiana Department of Child Services (DCS) presented sufficient evidence to support the termination of Parents' parental rights.

## FACTS AND PROCEDURAL HISTORY

Father and Mother are the biological parents of two children: J.A.E., born December 13, 2009, [1] and the Child, born July 3, 2012. Parents, who have never married, lived together in Mount Vernon, Indiana.

On March 27, 2012, when Mother was several months pregnant with the Child, she and Father were arrested for manufacturing methamphetamine in Father's mother's home in Evansville, Vanderburgh County, Indiana. Two-year-old

---

[1] Mother's parental rights to J.A.E. were terminated by default on October 28, 2013, and Father's parental rights to J.A.E. were terminated on December 27, 2013. Parents' rights to J.A.E. are not at issue in this appeal, but facts pertaining to J.A.E. are included where appropriate.

J.A.E. was in the home at the time police officers discovered the methamphetamine lab, so the Vanderburgh County DCS took him into custody and initiated protective proceedings. Parents were subsequently charged with dealing in methamphetamine as a Class B felony, neglect of a dependent as a Class C felony, and maintaining a common nuisance as a Class D felony.

[6] Just a few weeks before giving birth to the Child, Mother was released on bond and ordered to report to her probation officer. Father, however, remained in jail and was not present for the Child's birth. On August 14, 2012, he was convicted of all three charges, and on October 11, 2012, he received concurrent sentences of ten years, four years, and eighteen months for the Class B, Class C, and Class D felonies respectively, fully executed in the Indiana Department of Correction (DOC). Father has been incarcerated throughout these proceedings.

[7] On November 10, 2012, DCS received a report that Mother had deserted the four-month-old Child at a party. After Mother failed to return for the Child and was unable to be located, another party attendee contacted the Child's great-aunt, J.H., who picked the Child up. J.H. and other relatives unsuccessfully attempted to contact Mother. DCS removed the Child and placed him in foster care. A few days later, DCS interviewed Mother. She denied leaving the Child unattended at a party, claiming instead that her cousin was babysitting him.

[8] On November 14, 2012, DCS filed a petition alleging the Child to be a Child in Need of Services (CHINS). On November 21, 2012, DCS placed the Child in J.H.'s care. DCS also arranged for Mother to have supervised visitation with

the Child, but Mother consistently canceled or failed to show up. On March 25, 2013, Mother was arrested for violating the conditions of her bond. In addition to failing to attend her counseling sessions, Mother had submitted forged documentation of her attendance at Narcotics Anonymous meetings. For the next six months, pending the resolution of her criminal charges, Mother was incarcerated at the Vanderburgh County Jail.

[9] On April 1, 2013, the trial court adjudicated the Child to be a CHINS. At the dispositional hearing on April 23, 2013, the trial court modified the Child's relative placement to that of his paternal aunt and uncle, H.D. (Aunt) and A.D. (Uncle). The trial court ordered Mother to contact DCS upon her release from jail in order to complete her previously-ordered services. As to Father, the trial court ordered him "to participate in any program that may help with parenting while incarcerated as part of the parental participation agreement." (Appellants' App. p. 17). In a subsequent proceeding, the trial court ordered that J.A.E. also be placed with Aunt and Uncle. Aunt and Uncle intend to adopt both children.

[10] In June of 2013, due to Mother's ongoing incarceration, DCS discontinued her visitation with the Child. On July 9, 2013, the trial court issued an order permitting the Child to visit Father in the DOC. Thereafter, Aunt began taking the one-year-old Child to see Father every two weeks, for two to three hours at a time.

[11] On September 11, 2013, pursuant to a plea agreement, Mother pled guilty to Class B felony dealing in methamphetamine, Class C felony neglect of a dependent, and Class D felony maintaining a common nuisance. On October 9, 2013, the trial court imposed concurrent sentences of eight years, two years, and one year respectively, entirely suspended to home detention. One week later, Mother failed to appear to be placed on electronic monitoring and was, again, taken into custody. On December 3, 2013, the trial court ordered Mother's transfer to a work release program in order for her to obtain employment to pay the electronic monitoring fees. A few months later, Mother was placed on electronic monitoring, and she moved into a safe house.

[12] At various points between Mother's intermittent periods of incarceration, DCS referred her to services in accordance with her parental participation plan. DCS provided Mother with a parent aide, who helped her secure housing and employment, but Mother was fired from two jobs for failing to show up, and she was evicted from her apartment. In addition, Mother was required to submit to at least five drug screens per month, but she went only sporadically. However, the drug screens that Mother did take were all negative for illicit substances. Mother was ordered to undergo a substance abuse evaluation and follow any treatment recommendations. She completed the evaluation, which recommended outpatient substance abuse counseling, but attended only two therapy sessions. Despite the trial court's directive for her to contact DCS upon her release from incarceration, Mother never made any attempt to reinitiate her services; nor did she seek to visit the Child or even inquire about his well-being.

[13]     Due to Father's incarceration, DCS was unable to provide him with any services. However, pursuant to the trial court's mandate, he completed the DOC's Responsible Parenting program. Father also received a sentence reduction for completing the PLUS program, which he explained offered "a lot of classes . . . about the important things in life like bettering yourself as a parent and how you affected other people with your drug problems and stuff like that." (Transcript p. 27). Father also completed an addiction class and was enrolled in a substance abuse program. Along with their twice monthly visits, Father testified that he talks to the Child every night on the phone.

[14]     On February 24, 2014, DCS filed a petition to terminate Parents' parental rights to the Child. On April 17, 2014, the Child's court-appointed special advocate (CASA) tendered a report to the court, recommending that "[i]f Father's [sentence] modification on [April 24, 2014] allows his early release from incarceration within [ninety] days, he should be given [six] months to participate in services and visitation to demonstrate his parenting abilities before termination of his rights are pursued." (Appellants' App. p. 25). However, in the event that Father was not granted an early release, the CASA advised that termination was appropriate. On April 24, 2014, Father's motion for a sentence modification was denied.

[15]     On April 28, 2014, the trial court conducted the termination hearing. Mother was present, and Father appeared by telephone. Prior to the introduction of evidence, Father made a motion for a continuance of the termination hearing based on the CASA's recommendation that he be given additional time to

participate in services. Notwithstanding that his sentence modification was denied, Father contended that a continuance was appropriate because he planned to re-apply for a sentence modification in four months and because his earliest projected release date was now September of 2016 instead of 2017. Mother joined in Father's motion, claiming that "she believe[d] herself to be on track . . . and would like the opportunity to be reunified with the [C]hild." (Tr. p. 8). The trial court declined to continue the matter and proceeded with the hearing. On June 16, 2014, the trial court entered its Order, terminating Parents' parental rights.

Parents now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Motion for Continuance*

Father claims that the trial court abused its discretion by denying his request to continue the termination hearing. In a termination of parental rights case, our court reviews a trial court's ruling on a continuance motion for an abuse of discretion. *In re E.D.*, 902 N.E.2d 316, 321 (Ind. Ct. App. 2009), *trans. denied*. The denial of a motion for a continuance may be an abuse of discretion if "the moving party has shown good cause for granting the motion, but no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial." *In re K.W.*, 12 N.E.3d 241, 244 (Ind. 2014) (internal quotation marks omitted).

[18] At the start of the termination hearing, Father and Mother jointly requested that the trial court continue the matter in order to allow them additional time to establish their fitness as parents. Father now asserts that he had "good cause" for a continuance "due to the fact that he could be released from prison in a mere four months, and at most in 2016. He would be able to participate in services and have a strong foundation of drug treatment, prison programs, and not using drugs behind him." (Appellants' Br. p. 7). Moreover, he insists that he was prejudiced by the denial of the continuance because he was precluded from being "able to demonstrate to the court that he had stable housing, stable income, could comply with DCS's provision of services, and was able to parent [the Child]." (Appellants' Br. p. 7). [2]

[19] Our court has previously found good cause to justify the continuation of a termination hearing where, like Father, the parent was incarcerated but desired an opportunity to participate in DCS services upon his release. *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*. In *Rowlett*, we recognized that the father was incarcerated "by his own doing." *Id.* Nevertheless, because the father was set to be discharged from prison only six weeks after the termination hearing, and because the children were already placed with the relative who would adopt them, we held that a continuation of the matter until his release "would have

---

[2] Although Parents filed a consolidated appellate brief, Mother has not separately argued that she also had good cause for a continuance and was prejudiced by the trial court's denial thereof. Accordingly, the issue is waived as to Mother. Ind. Appellate Rule 46(A)(8)(a).

had little immediate effect upon the children." *Id.* We find that *Rowlett* is distinguishable from the case at bar.

[20] Contrary to the father in *Rowlett*, at the time of the termination hearing, Father's release date was not imminent. Just four days before the hearing, the sentencing court declined to modify Father's sentence; thus, his earliest possible release date was not until September 19, 2016—nearly two and one-half years away. Father's assertion that a subsequent modification petition *could* result in his release within four months was purely speculative. *See In re M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996) (finding that a delay would be detrimental to the child "especially since [the father's] early release from prison is not guaranteed"), *trans. denied*.

[21] Father argues that "to 'insist upon expeditiousness' in the face of the request violated [his] right to due process." (Appellants' Br. p. 7). "While continuances may be necessary to ensure the protection of a parent's due process rights, courts must also be cognizant of the strain these delays place upon a child." *In re E.D.*, 902 N.E.2d at 321. Father's efforts to communicate with the Child and to participate in the available DOC programs are certainly admirable, but by the time of the termination hearing, the Child had already spent more than half of his young life in either foster care or relative placement. Even considering the hypothetical possibility that Father might have been released only four months after the scheduled termination hearing, the CASA indicated that he would have needed *at least* six more months to establish stable housing and employment and to demonstrate his fitness as a parent. Thus, a

continuance would have served only to delay the Child's permanency for nearly another year with no guarantee that Father would succeed. *See C.T. v. Marion Cnty. Dep't of Child Servs.*, 896 N.E.2d 571, 587 (Ind. Ct. App. 2008), *trans. denied*. Accordingly, we cannot say that the trial court abused its discretion in denying Father's motion for a continuance.

## II. *Termination of Parental Rights*

### A. *Standard of Review*

The parent-child relationship is one of the most revered relationships in our society, and a parent's interest in having "care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)), *reh'g denied*. Thus, the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children without undue governmental interference. *Id.* However, when "parents are unable or unwilling to meet their parental responsibilities[,]" their rights may be terminated. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). The termination of a parent's rights "is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children. Therefore, termination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* The purpose of terminating parental rights is to protect the children—not to punish the parents. *Id.* at 91-92.

In this case, the trial court entered findings of fact and conclusions thereon to support its termination of Parents' rights. Thus, on review, our court "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). In determining whether the trial court's decision is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013). We will consider only the evidence and any inferences that may reasonably be derived therefrom that are most favorable to the trial court's judgment. *In re G.Y.*, 904 N.E.2d at 1260. We do not reweigh evidence or assess the credibility of witnesses. *Id.*

## B. *Sufficiency of the Evidence*

Parents claim that there is insufficient evidence to support the termination of their parental rights. To support a termination, DCS must prove, in part,

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS bears the burden of proving each of these elements by clear and convincing evidence. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Id.* (internal quotation marks and citations omitted).

Parents contend that "[n]either the trial court's findings of fact nor the evidence sufficiently provides clear and convincing evidence that the conditions that resulted in the removal of [the Child] will not be remedied, that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of [the Child], or that termination of parental rights is in the best interests of the [C]hild." (Appellants' Br. p. 19).

### 1. *Conditions Resulting in Child's Removal Unlikely to Be Remedied*

In determining whether there is a reasonable probability that the conditions which necessitated a child's removal and continued placement outside the home will not be remedied, the trial court must assess the parent's fitness to care for his or her child "at the time of the termination hearing, taking into consideration evidence of changed conditions." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 373 (Ind. Ct. App. 2006), *trans. denied*. This requires evaluating "the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the

children." *Id.* The trial court "may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment[,]" as well as the parent's participation in any available services. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). A termination of parental rights may not "be based entirely upon conditions which existed in the past, but which no longer exist." *In re T.C.*, 630 N.E.2d 1368, 1374 (Ind. Ct. App. 1994), *reh'g denied*; *trans. denied.*

[27] On appeal, Parents do not specifically challenge any of the trial court's findings as being unsupported by the evidence. Instead, Father contends that the trial court erroneously concluded that the conditions resulting in the Child's removal were unlikely to be remedied because "[t]here was ample support for [a] delay" to afford him the opportunity to participate in services to determine whether he could be reunited with the Child. (Appellants' Br. p. 11). As our court has previously established, "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro*, 842 N.E.2d at 374. Nonetheless, Father directs our attention to his regular communication with the Child during his incarceration; his "impressive efforts" in the DOC, including maintaining sobriety and participating in substance abuse and parenting courses; and that he plans to live and work with his father upon his release. (Appellants' Br. p. 12).

[28] We find that Father's argument is simply a request to reweigh the evidence in his favor by finding that the circumstances regarding his inability to care for the

Child have changed, which we decline to do. It is well established that DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. Here, the Child's removal was necessitated, in part, by Father's inability to provide care and supervision. As the trial court found, by the time of the termination hearing, Father was still incarcerated and unable to furnish the Child with shelter, food, clothing, and supervision. Father's expected release date was not to occur for another two and one-half years, which would prevent him from "remedy[ing] those conditions within a meaningful timeframe." *Castro*, 842 N.E.2d at 374.

[29] In addition, the trial court considered Father's significant history of drug abuse and criminal activity as indicative of the probability of future detrimental behavior. Father admitted that at the time he was arrested, he "had a drug problem" that included both methamphetamine and marijuana use. (Tr. p. 32). Although Father averred that he is now "done with the drugs and [is] ready to be a good father[,]" his sobriety has not been put to the test outside of the walls of the DOC. (Tr. p. 24). *See In re S.P.H.*, 806 N.E.2d 874, 881 (Ind. Ct. App. 2004) ("[I]t is the trial court's prerogative to conclude that [the father] might be drug free while in prison, but that based on his pattern of conduct it will not last once he is released and the probability will be high that the situation will once more become as it was before he was incarcerated."). Furthermore, Father has amassed a significant criminal record, including felony convictions of burglary

and unlawful possession of a firearm. His present incarceration stems from his decision to manufacture methamphetamine notwithstanding the fact that Mother was pregnant with the Child and that two-year-old J.A.E. was present in the house. The trial court's findings indicate that Father's "pattern of criminal behavior makes it unlikely that he will be able [support or contribute to the Child's upbringing] in a meaningful way in the future." *In re Wardship of J.C.*, 646 N.E.2d 693, 696 (Ind. Ct. App. 1995), *reh'g denied*; *trans. denied*.

[30] The trial court also noted Father's failure to demonstrate an ability to provide for the Child upon his release. Father testified that he plans to live with his father and also "work[] with him through Vectren." (Tr. p. 22). Yet, prior to his arrest in March of 2012, Father had been voluntarily unemployed for at least three years, and no other evidence was produced to establish that he has, in fact, secured a job. From the record, it does not appear that Father completed any vocational training, educational pursuits, or other DOC programs that would assist him with transitioning into society and being able to provide for the needs of the Child. As to his housing plans, Father did not indicate whether, or for what duration, the Child would be welcome to live in the paternal grandfather's home; nor is there evidence as to whether the housing would be suitable for the Child. Taken together, the evidence reveals that Father has a habitual tendency to put his own reckless interests above the needs of his Child, and it was well within the discretion of the trial court to accord greater weight to the evidence of Father's probable future neglect than to the evidence of his recent progress. *See K.T.K.*, 989 N.E.2d at 1234.

[31]     As to Mother, we note that she has not proffered a single argument on her own behalf to contest the trial court's conclusion that the conditions resulting in the Child's removal will not be remedied, thereby waiving her claim. App. R. 46(A)(8)(a). Waiver notwithstanding, we find that the record contains sufficient evidence to support the trial court's determination. While pregnant with the Child, Mother was arrested for manufacturing methamphetamine alongside Father. Despite being granted an opportunity to care for the infant Child while released on bond, Mother left him unattended at a party and did not return. Moreover, Mother demonstrated an utter indifference to maintaining her relationship with the Child throughout his removal. She canceled the majority of her visits, and during the few visits that she did attend, Mother did not interact with the Child. DCS helped her find employment and housing, but she quit both jobs and was subsequently evicted from her apartment. Mother did not complete her mandatory substance abuse counseling, and she failed to regularly appear for her drug screens. Not only did Mother fail to take advantage of DCS services, she also repeatedly violated the conditions of her bond and house arrest, resulting in prolonged periods of incarceration. Even when she was not incarcerated, Mother did not communicate with DCS, she never requested visitation, and she did not attempt to contact the Child. At the time of the termination hearing, Mother had not seen the Child in over a year. Accordingly, we find no error in the trial court's

determination that the conditions warranting the Child's removal are unlikely to be remedied.[3]

### 2. *Best Interests of the Child*

[32] In determining a child's best interests, the trial court must consider the totality of the evidence, looking "beyond the factors identified by DCS." *H.G. v. Ind. Dep't of Child Servs.*, 959 N.E.2d 272, 289 (Ind. Ct. App. 2011), *reh'g denied*; *trans. denied*. In so doing, the trial court must subordinate the parent's interests to those of the child. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). A trial court need not postpone termination of the parent-child relationship until after a child has been irreversibly harmed. *A.D.S.*, 987 N.E.2d at 1158.

[33] Our court has previously determined that, in addition to evidence that the conditions resulting in a child's removal will not be remedied, "the recommendation by both the [DCS] case manager and child advocate to terminate parental rights . . . is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *Id.* at 1158-59. Once again, Mother has not raised a separate argument on her own behalf. App. R. 46(A)(8)(a). Waiver notwithstanding, we find that there is sufficient evidence to establish that terminating her rights is in the Child's best interests because

---

[3] Having determined that DCS met its burden to prove that the conditions resulting in the Child's removal will not be remedied, we need not address the sufficiency of evidence regarding whether the continuation of the parent-child relationship poses a threat to the Child's well-being. *See Castro*, 842 N.E.2d at 373 (citing I.C. § 31-35-2-4(b)(2)(B)).

both the DCS case manager and the CASA recommended termination based on her lack of involvement and effort throughout the case.

[34] As for Father, the trial court relied on both the opinions of the DCS case manager and the CASA in determining that termination of his rights was in the best interests of the Child. According to the DCS case manager,

> I feel like this kid needs permanency as soon as possible. At this point we're not even sure when [Father] will get out of incarceration. But this [C]hild, especially due to his young age, is so impressionable right now and he needs a family setting. He needs to know he's safe there no matter what and to know that he's not gonna be going back and forth between households. We need to establish that for him that early so that there's not issues when he gets older.

(Tr. p. 111). The CASA added that placement with Aunt and Uncle

> is where [the Child] is thriving. There's a sibling that is there and that bond is very strong. They have two other children that are about that same age and they are managing them well. He goes to daycare. He's very happy and well adjusted. I didn't see any safety concerns. He played with his [A]unt, which is where he's at, and the [U]ncle was in the home. There was a lot of playing and a lot of back and forth between them. He just seemed very comfortable.

(Tr. p. 89). The trial court found that Aunt and Uncle plan to adopt the Child "and will keep him safe and provide a stable home." (Appellants' App. p. 20).

[35] Although Father does not challenge any of the trial court's specific findings, he analogizes his situation to prior cases in which Indiana appellate courts found insufficient evidence to support a conclusion that termination would be in the child's best interests: *In re G.Y.*, 904 N.E.2d at 1257; *In re J.M.*, 908 N.E.2d 191 (Ind. 2009); and *H.G.*, 959 N.E.2d at 272. In each of these cases, the parent was

incarcerated at the time of the termination hearing but had demonstrated a "willingness to continue working toward reunification" and had "made significant efforts at self-improvement." *H.G.*, 959 N.E.2d at 293. Additionally, the parents in these cases had been actively involved in their children's lives prior to their convictions; they had endeavored to find suitable care for their children after being arrested; they had secured housing and employment prior to their release; and they were scheduled to be released within relatively short periods of time. *See In re G.Y.*, 904 N.E.2d at 1262-65; *In re J.M.*, 908 N.E.2d at 192, 194-95; and *H.G.*, 959 N.E.2d at 291-92. As a result, our courts found that termination should be deferred until the parents had been released and afforded an opportunity to establish their ability to care for their children.

[36] Father has likewise made a "daily effort" to establish a relationship with the Child and to improve himself in the DOC. (Tr. p. 93). Nevertheless, we find Father's case to be readily distinct from the others. Father had no relationship with the Child prior to his conviction. At the time he committed his most recent three felonies, he was well aware of the Child's impending birth. Yet, he chose to manufacture methamphetamine—a notoriously dangerous undertaking—in the presence of pregnant Mother and two-year-old J.A.E. Following his arrest, Father made no arrangements for the care of his children, instead leaving the welfare of his unborn Child entirely in the hands of Mother even though she was also facing criminal charges. Father was absent during the Child's birth, and he did not even have visitation until after the Child's first

birthday. Notably, it was the DCS case manager—not Father—who requested the visitation privileges for Father because

> [Aunt] was going to visit the [F]ather on a regular basis and regardless if his rights are terminated or not, . . . [s]o I started the visits because I wanted to see if there would be appropriate interaction to see if the permanency plan would even work. If there couldn't be appropriate interaction with visits in a prison, then it would make me rethink my placement, knowing that he's eventually gonna be around.

(Tr. pp. 109-10).

To this day, Father's only interaction with the Child has occurred within the secure environment of the DOC. His release date is not imminent. When he is released, the Child will be approximately four years old and will have spent nearly his entire life in the care of relatives. Although Father has participated in several DOC programs, his employment and housing prospects—as well as his sobriety—are tentative, at best. "Even assuming that [Father] will eventually develop into a suitable parent, we must ask how much longer [the Child] should have to wait to enjoy the permanency that is essential to [his] development and overall well-being." *Castro*, 842 N.E.2d at 375. Therefore, we find no error in the trial court's conclusion that termination of Parents' rights is in the Child's best interests.

## CONCLUSION

Based on the foregoing, we conclude that the trial court acted within its discretion in denying Father's motion for a continuance. We further conclude

that clear and convincing evidence supports the termination of Parents' parental rights.

[39] Affirmed.

[40] Vaidik, C.J. concurs

[41] Baker, J. dissents in part with separate opinion

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of K.E., a minor child, and<br><br>J.E. (Father), and S.S. (Mother),<br><br>*Appellants-Respondents,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | Court of Appeals Case No.<br>82A04-1407-JT-320 |

**Baker, Judge, dissenting in part.**

[42]     I respectfully dissent from the resolution reached by the majority with respect to Father. It has become well established that the mere fact of a parent's incarceration is an insufficient basis on which to terminate the parent-child relationship. *See, e.g., In re G.Y.*, 904 N.E.2d 1257, 1264-66 (Ind. 2009).

[43]     In this case, Father has done everything DCS and the juvenile court asked of him during his incarceration. He has completed a Responsible Parenting

program, the PLUS program, and an addiction class, and was actively participating in a substance abuse program. Father visited with K.E. in person twice each month and spoke with the Child on the phone *every night*. There is nothing he could have done better; there is nothing more he could have done. Thus, all that remains is the fact of his incarceration. I believe that to be insufficient to support termination, given the gravity and permanency of termination of the parent-child relationship.

[44] I acknowledge that unlike many of the cases cited by Father, his release is not imminent. But his release is also not a decade away. Instead, his earliest possible release date as of the time of the termination hearing was September 2016. The Child is in a stable, loving, and appropriate placement with Aunt and Uncle. Indeed, this placement is so appropriate that the family is preadoptive. Thus, I see no risk of significant harm to the Child if the termination proceedings were put on hold until Father is released and has time to establish a life and participate with court ordered services. I do not believe that waiting another year—or two years, from the date of the termination hearing—is putting K.E. "on a shelf[.]" *Id.* at 1263. Instead, I believe that affording Father the extra time to finish his term of imprisonment is a sensible, fair, and justified action to take to avoid the "last resort" of termination. *Rowlett v. Vanderburgh Cnty. Office of Family and Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006).

[45] I find this Court's opinion in *H.G. v. Indiana Department of Child Services* to be instructive. 959 N.E.2d 272 (Ind. Ct. App. 2011). In *H.G.*, the Mother was

incarcerated throughout the CHINS and termination proceedings, with an earliest possible release date that was more than two years after the date of the termination hearing. The juvenile court terminated the parent-child relationship, and this Court reversed, observing the lengths to which Mother had attempted to comply with DCS and maintain a relationship with her children while incarcerated:

> Mother has been cooperative and involved in the children's cases, has a bond with her children, has maintained regular contact with them, has attempted to have the children placed with relatives, has taken advantage of opportunities to improve herself while incarcerated, and has made every effort to earn an early release. . . . [H]er ability to parent can be quickly assessed once she is released. The evidence does not support the trial court's conclusion that termination of Mother's parental rights is in the children's best interests.

*Id.* at 291-92. As in *H.G.*, Father has done all that has been asked of him—and more. And as in *H.G.*, I believe that we should reverse the termination order.

[46] If our caselaw standing for the proposition that incarceration alone is an insufficient basis to terminate the parent-child relationship is to have any teeth or meaning whatsoever, I believe it should be applied in this case. As a result, I would reverse the juvenile court's order terminating the parent-child relationship between Father and K.E. and remand for further proceedings pending Father's release from incarceration. In all other respects, I concur with the majority.