# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 02 2018, 9:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Emily A. Fehr
Public Defender
Fortville, Indiana

Nicole A. Zelin
Pritzke & Davis, LLP
Greenfield, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re The Termination of The Parent-Child Relationship of: Ca.B. and C.B. *(Minor Children),*

and

T.B. *(Mother),*

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 2, 2018

Court of Appeals Case No. 30A05-1711-JT-2788

Appeal from the Hancock Circuit Court

The Honorable Jeffrey Eggers, Judge

The Honorable R. Scott Sirk, Court Commissioner

Trial Court Cause Nos.
30C01-1704-JT-129
30C01-1704-JT-130

**Barnes, Senior Judge.**

# Case Summary

[1] T.B. ("Mother") appeals the termination of her parental rights to her children, C.B. and Ca.B. We affirm.

# Issue

[2] The restated issue before us is whether there is sufficient evidence to support the termination of Mother's parental rights.

# Facts

[3] Mother gave birth to C.B. on August 3, 2009, and to Ca.B. on July 13, 2013. C.B.'s father is C.H.[1] Ca.B.'s father is T.W.[2] On January 28, 2016, the Hancock County Office of the Department of Child Services ("DCS") received a report alleging that Mother was abusing heroin and methamphetamine, neglecting the children, and failing to properly supervise them. DCS family case manager Lauren Johnson made an unannounced visit to Mother and her boyfriend, T.W., and "observed [them] to be under the influence." App. Vol. II p. 3. Mother and T.W. "were sweating profusely," "had scabs on their faces

---

[1] C.H. is not a party to this appeal. He was incarcerated at the outset of the underlying CHINS action and could not take custody of C.B. C.B. was placed with C.H.'s mother, Roxann Swann, during the pendency, and she intends to adopt C.B.

[2] T.W.'s parental rights as to Ca.B. remain in effect. DCS is "giving him more time" because "[h]e has started to turn things around and he has been working on sobriety"; "he's been getting services and he's been consistently reporting to those services, he's been attending the meetings, [and] he's been in compliance." Tr. Vol. II pp. 94, 96.

and arms," and "there was a distinct odor in the master bedroom . . . that is similar to the smell of methamphetamine." Supp. Tr. Vol. II p. 10.

[4] Mother subsequently tested positive for methamphetamine, amphetamine, opiates, and THC. C.B. told Johnson that "he often has to take care of Ca.B."; that Mother and T.W. are "always in their bathroom and the door is locked"; he "has to feed [Ca.B.] and stay with him"; and "that he does not feel safe with [Mother] and T.W." *Id.* at 12. DCS removed the children from Mother's care.

[5] On February 2, 2016, DCS filed petitions alleging that C.B. and Ca.B. were Children in Need of Services ("CHINS"). The trial court conducted an initial and fact-finding hearing on February 11, 2016, and entered these findings:

> e) Mother and Father admit that [C.B.] is a Child in Need of Services;
>
> f) Mother used illegal drugs while [C.B.] was in her care and custody;
>
> * * * * *
>
> i) Due to her illegal drug use, Mother could not adequately supervise [C.B.];
>
> j) Mother continues to struggle with substance use;
>
> k) [C.B.] needs services that would not otherwise be provided or accepted without the coercive intervention of the Court; . . . .

App. Vol. II p. 4. The trial court made identical findings as to Ca.B.

The trial court conducted a dispositional hearing on April 6, 2016. In its ensuing order, the trial court found that the children should remain under DCS's wardship. Under DCS's case plan, Mother was to: (1) maintain contact with DCS and to provide updates regarding her contact information, household, employment, and criminal charges, if any; (2) allow scheduled/unscheduled DCS visits to assess her parenting; (3) keep appointments with DCS, the children's court-appointed special advocate ("CASA"), and their service providers; (4) obtain and maintain housing as well as sufficient means of income or support to raise the children; (5) ensure and actively participate in home-based counseling; (6) complete substance abuse and parenting assessments and follow all service providers' recommendations; (7) submit to random drug screens upon request; (8) abstain from possessing or using illegal drugs; (9) comply with supervised visitation; and (10) provide a safe, secure, abuse- and neglect-free environment for the children.

During the CHINS pendency, DCS referred Mother to Medicaid, out-of-home placement, supervised visitation, sibling visitation, individual therapy, random drug screens, and substance abuse treatment services. Mother, however, grew increasingly apathetic and "was unsuccessfully closed out of all services due to non-compliance." *Id*. at 6. In the twenty-month CHINS pendency, she visited the children only once; consistently failed to comply with DCS's case plan; and failed to maintain contact with DCS. Her counsel was allowed to withdraw "due to [M]other's lack of participation." *Id*.

[8]     The record reveals that, after various review hearings, permanency hearings, and hearings on motions for rule to show cause, the trial court consistently found Mother's efforts to be lacking as follows:  Mother (1) "has not complied with the child[ren]'s case plan"; (2)" has not complied with the dispositional order"; (3) "has not maintained contact with the Department"; (4) "has not engaged in services as ordered"[3]; (5) "has not provided any changes in address, household composition, employment or contact information" such that as of January 25, 2017, DCS did "not have a current address or phone number for Mother" and was "unable to verify that Mother's home is suitable, safe and stable for the children; (6) has "provided false information to the DCS that she completed an intensive outpatient treatment program, but the alleged service provider had not provided that treatment for mother, and [M]other had failed to attend the scheduled intake appointment"; (7) was "unsuccessfully discharged from supervised visitation due to noncompliance"; (8) "had open referrals for substance abuse treatment since 2/2/2016, but has not completed any treatment programs"; (9) "was unsuccessfully discharged from home-based casework, individual therapy, and parenting education due to non-compliance"; (10) "never completed her clinical interview and assessment"; (11) "has not provided consistent drug screens"; (12) "has done nothing [in the twenty-month pendency] to improve her ability to parent the child safely"; (13) was

---

[3] Mother contacted the family case manager in July 2016 following a hearing in which she was found in contempt and admonished to communicate with DCS.  "However, when she would contact the family case manager, she would typically provide an excuse as to why she was not able to come in to submit a drug screen."  App. Vol. II p. 10.

unsuccessfully discharged from home-based casework and home-based therapy programs due to noncompliance; (14) failed to complete a clinical interview and assessment; (15) no-call-no-showed for multiple appointments with the family case manager; (16) "has not provided any proof of any legal and stable sources of income" such that DCS "is unable to determine if Mother has sufficient income to financially support her children"; (17) provided no drug screens from April 2016 until July 2017, after which she "provided a few drug screens" but again failed to submit to drug screens as requested after July 20, 2017, such that DCS "[wa]s not able to verify that Mother [wa]s not currently using, manufacturing, trading, selling, possessing or distributing any illegal controlled substances"; (18) was unsuccessfully discharged from parenting education for noncompliance; (19) "was discharged from supervised visitation due to noncompliance"; and (20) "[d]ue to Mother's lack of compliance and failure to appear to court hearings throughout her case," she was unsuccessfully discharged from all services [and] cease of services was ordered on 04/12/2017."[4]  App. Vol. II pp. 6-7.

---

[4] DCS referred Mother to the following non-exhaustive list of services during the pendency; she was unsuccessfully discharged from each one for non-compliance:  (1) LifeLine Youth and Family Services for Supervised Visitation on February 8, 2016; (2) LifeSolutions for home-based case work and individual therapy on April 6, 2016; (3) Volunteers of America for inpatient substance abuse treatment on February 2, 2016; (4) LifeLine Youth and Family Services for parenting education on April 6, 2016; and (5) Indianapolis Treatment Center.

[9]    DCS's wardship of the children resulted from Mother's drug abuse.  During the twenty-month pendency of the CHINS action, she was arrested for dealing ten or more grams of methamphetamine.  The trial court's findings state,

> Mother is currently facing felony 2 charges under cause 49G21-1703-F2-9974 for dealing in Methamphetamine Manufacture/Deliver/Finance - 10 or more grams.  Mother's co-defendant is also facing charges for dealing.  The prosecutor indicated that the co-defendant is an illegal [alien] in this country and is facing multiple charges on the federal level due to his illegal [alien] status as well as his drug charges.  Mother made phone calls while incarcerated.  Those calls were to her associates.  She told her associates that if they did not bail her out of jail, she would tell law enforcement everything she knows about the drug business.  Mother was subsequently bailed out. The prosecutor informed DCS that these individuals are not your "run-of-the-mill pot smokers" but are trafficking large amounts of drugs into our community.  Mother's involvement in a dangerous criminal enterprise, along with her drug use, pose a safety threat to her, as well as any children that may be in her care.  At this time, the Department does not believe it is safe or appropriate to allow [M]other to have access to her children, as their safety and best interest is paramount in this CHINS matter.

*Id*. at 9.

[10]    Although Mother often stated that she wanted to reunite with the children, she failed to undertake the necessary steps to effect reunification.  The trial court's findings state,

> 4. Mother has been given the opportunity by the Court and DCS to re-engage in services in an attempt to reunify with her child[ren].  DCS has offered random drug screens and

scheduled a case plan conference to discuss further services. Mother has not come in to submit to drug screens as asked. Mother has been unsuccessfully discharged from all services referred by the Department;

* * * * *

12. The Court, at the permanency hearing on 7/12/2017, continued the TPR hearing regarding the child and changed the permanency plan to a concurrent plan of adoption and reunification. The Court made it clear that this was [M]other's last opportunity to make a change and comply with services. Mother has not complied with services, has not improved in her parenting ability, and continues to put her own desires before the best interest of her child[ren].

13. Mother testified, under oath, that she has not used any illegal substances since the permanency hearing on 7/12/17. She testified that she has no positive drug screens during the period from that date until the court hearing today.

14. The Court entered an order for release of [M]other's records from Indianapolis Treatment Center.

15. Mother then informed the court that her previous statement of not using illegal substances was untrue and there were positive screens for illegal substances. Mother thereby admitted to committing perjury at the hearing on 8/16/17 in this cause.

*Id*. at 11-12.

[11] On April 18, 2017, DCS filed petitions to terminate Mother's parental rights to C.B. and Ca.B. The trial court conducted a fact-finding hearing on the petitions for termination on October 25, 2017. DCS assessment family case manager Lauren Johnson testified that she received the initial report about Mother's substance abuse and that she interviewed Mother and T.W. Johnson performed a home environment check, administered drug screens, and removed the children after Mother and T.W. tested positive for methamphetamine. Johnson testified that she referred Mother to supervised visitation, residential substance abuse treatment, home based casework, home-based therapy, and parenting education, among other services. Tr. Vol. II p. 18.

[12] DCS family case manager Connor McCarty testified that he took over Mother's case in July 2016, but that Mother "did not stay in contact" and, except for "brief[ ]" contact in July and August 2016 and "one or two phone calls" before December 2016. *Id.* at 30. He testified that Mother failed to provide up-to-date contact information, failed to submit to regular drug screens, failed to complete her substance abuse assessment and was unsuccessfully discharged, and provided inaccurate information regarding her enrollment in intensive outpatient classes to address her substance abuse.

[13] Mother failed to engage in services, even after DCS filed multiple rule to show cause motions regarding her lack of effort. He testified that Mother lied about remaining sober, but "went back and stated that she had lied and . . . did test positive." *Id.* at 34. He testified further,

Since the time of removal Mother has continued to test positive as well as received unsuccessful discharges from any service that has tried to help her and change – and address her challenges, as well as now she has legal involvement and has been incarcerated quite a few times.

*Id*. at 39. Mother contacted McCarty in March 2017 and "indicated . . . that she would like to meet and go over services again." *Id*. at 32. He testified that DCS did not restart services because she failed to demonstrate consistency and because she "was not clean and sober during the summer." *Id*. at 111.

[14] McCarty testified as follows regarding the children's progress in placement:

> [C.B.] has had ups and downs as far as his emotions and being very angry and having anger outbursts, not being able to control that anger or being able to express a lot of the trauma that he went through. He's very – was very agitated. He was diagnosed with ADHD and PTSD, they had a lot of – or had a lot of issues in school as far as being able to focus and listen as well as trouble at home being able to – to there again follow, obey rules and things of that nature.
>
> * * * * *
>
> [C.B.] still has ups and downs, he's got some really good—good weeks, and then as things come up he processes through them. But he's fully engaged in his therapy with—he's got two . . . therapists at this point. He's got an individual therapist that he sees outside of school and then he also sees a therapist at school that's able to do—work on social skills and group activities after school. And he's able to—has done a lot better at being able to express his emotions, and grandparents have done a phenomenal job as well as working in that therapy and being engaged to help

take what he learns in therapy and be able to engage that at home to help calm him down, learn appropriate coping skills and things of that nature.

*Id*. at 42-43. McCarty testified that he recommends adoption by C.B.'s paternal grandparents and that delaying adoption to allow Mother to more time to "get things together" would exacerbate C.B.'s behavioral issues and anxiety and could "caus[e] continued trauma" because C.B. craves permanency. *Id*. at 44.

[15] As to Ca.B., McCarty testified that, upon removal, he was developmentally-delayed, nonverbal, and had dietary issues. In placement, Ca.B. "is engaged in services . . . . receives speech therapy as well as individual therapy and he— we're working towards visitation with Father [T.W.]." *Id*. at 47. McCarty testified that it is in Ca.B.'s best interest to be adopted in his foster placement or reunified with T.W.

[16] Child mental health therapist Becky Vandenburgh testified that she provided biweekly therapy services to C.B. for almost two years. At the outset of his therapy, C.B. "was a very sad, distraught little boy"; had "witnessed a lot of things . . . that he should not have" and "was very scared and broken and angry and hungry." *Id*. at 54. C.B. has "ADHD, PTSD, parent/child neglect, [and]anxiety." *Id*. Vandenburgh focused on "get[ting] him to feel safe and secure in an environment [with] rules and structure and food and doctor's appointments and clothing" because

if you don't have those you can't start to have safety, security, emotional development, you can't focus in school. If you're

always hungry, that's your focus of where am I going to get my next meal. And I say that because he would tell me he wasn't fed.

*  *  *  *  *

When we first started drawing together he drew a picture of this Mother with a chainsaw and he was chopping her up, so we saw a lot of anger. And in talking about that it's—it's hurt right? It's pain. And he would say I love her but I hate her because she does drugs. Those are her—his words right. Lots of guns, I would see lots of scribbling of red, anger, hurt, pain. Sometimes he would draw a picture and then he would yell at it and cuss at it and I said you can say whatever you need to say in here. In our sandbox therapy you have a bunch of different toys you can pick from and they play out—they re-enact kind of their experience and what they've been through. So a lot of times he would be picking police officers and army people, guys with guns and swords and they – they would be fighting. So again, he— he's seen police come to the house, he's seen—he would say Mom would lock herself up in the bathroom or bedroom and not come out because – and he knew she was doing drugs, he would say he'd see needles and syringes. And over and over again he would say I hate her, I wish she would get sober, I don't want to talk to her until she gets sober.

*Id*. at 55-56. Vandenburgh testified that C.B.'s paternal grandmother, Roxann Swann, is consistent, reliable, actively participates in his therapy, adopts his therapists' recommendations and suggestions, and "has been a huge protective factor in his being a successful, loving, productive individual when he grows up." *Id*. at 59. Vandenburgh testified that Mother has never participated in

C.B.'s therapy and that she has "never once heard from her." *Id.* at 59.

Vandenburgh has observed "[a] ton" of progress":

> [C.B. is] happier. He's—he's engaged, he can play games and he can cooperate, he can share, he can—he's polite . . . . He's doing better in school. I remember one of the things he said to me was Mommy—I never went to school, they never made me go to school and I like school, I like to go and learn. Now since he's started there he's had ups and downs at school which is normal for what he's been through that he's gonna have some issues with focusing and anxiety and some of the stomachaches and headaches that he would have. But we've seen a lot of progress.

> * * * * * One of the last times I asked him to draw something that was—draw a picture of the rain. So it was very open to him and he drew a picture of himself in the rain with an umbrella over him which is an indicator that now he has some . . . coping skills that he now knows when I'm in the rain in need this protection. So the umbrella is a symbol of where and how he's progressed from guns and chainsaws and anger and sadness to now I'm safe and I have protection.

*Id.* at 57-58. Vandenburgh testified that delaying termination of Mother's parental rights would deny C.B. "a better prognosis"

> [because] he needs the stability. . . .[H]e needs just to kind of be done and to know that he has a safe place that he can call home and it's now—well, what's gonna happen next, do I have to go back with her, will she be sober, how long will this take.

*Id.* at 59.

[17]     C.B.'s paternal grandmother, Roxann Swan, testified that, among other times, C.B. "lived with [her] "from 2009 through 2013" and "from January through April 2015," when "Mother needed some assistance, she was trying to help herself get off of drugs . . . . ." *Id*. at 65. Swann had the following concerns while C.B. was in Mother's care:

> [C.B.] had PTSD, he was in need of glasses and had not gotten his exam, he was six and had never been to the dentist, he was catching strep throat a lot. I think it was just – that was due to immune system breakdown because he was not getting an adequate amount of sleep.

*Id*. at 65. She also testified about C.B.'s linked issues relating to food and anxiety, including devouring his food, obsessing about the availability of food in the future, and being fearful of "tak[ing] the last piece of [food]." *Id*. at 66. She testified further,

> . . . [H]e would have to play his Xbox all day because—so he wouldn't think about being hungry. He was raising and taking care of his brother and he would give up his food to make sure his brother was taken care of. There—he would—he had mentioned being locked in the closet so he did not—he does not like doors closed most of the time.

> * * * * *

> It was basically that they weren't feeding the kids. He said—he had told me that they—there was not much food other than maybe ice cream once in a while or juice. It was not accessible to him. He had mentioned to me one time—he said that Mommy had gone to the store and she came home with a bunch of food

and he was so happy but it all got put up and it was never accessible to him. He stated that on a couple of occasions that [T.W.] had fixed a meal and he said I could smell it, I could see it looked so good, I was so hungry but he took it upstairs to the bedroom and ate and I didn't get any. He did state that he was given a box of food for Christmas but that there was a note in it saying that he had to pay for it.

*Id*. at 67-68. In Mother's care, C.B. had a record of excessive school absences and tardy notices; and in placement, Swann remedied his school attendance record and participation. C.B. is enjoying "the normal things" in family life and visiting with Ca.B., while also "relinquish[ing] that caregiver role." *Id*. at 75.

[18] Abby Jackson, foster mom to Ca.B, testified that, when Ca.B. was placed with her, he had a compromised immune system, was underweight, developmentally-delayed, had an extremely limited diet, struggled with different textures of foods, hoarded toys, and "just wasn't functioning as a normal child." *Id*. at. 82. She testified that, although he has demonstrated improvement after referrals for speech therapy, developmental special needs preschool, he still displays some abnormal behaviors:

> For one, he doesn't know how to be carried. * * * * * He don't [sic] even know how to ride on your hip like any child knows from an infant. When he goes to bed at night he does not get out of his bed in the morning. He waits for you to come get him still to this day. He um – he will lay there forever and ever and ever until you either come get him or now he'll say Mama, Mama and he'll let me know he's awake and then I'll come in and get him and then he'll get out of his bed. He doesn't like any doors

closed . . . . He's scared to death of having closet doors shut. He
– he's scared to death to be left alone in a dark car (inaudible) be
riding in a dark car at night. He's still voicing those concerns
now two years after being removed.

*Id.* at 83-84. Jackson noted that (1) she has participated in Ca.B.'s therapies and has learned skills to help him cope; (2) Mother has not engaged in any of Ca.B.'s services; (3) Ca.B. is now "extremely bonded" to her; (4) Ca.B. eats a broader, healthier range of foods; (5) Ca.B.'s speaking ability is much improved; and (6) Ca.B. enjoys a more normal sibling relationship with C.B, whom he sees "at least every other week if not once a week." *Id.* at 85, 87. Lastly, she testified that she and her husband want to adopt Ca.B. and that "he's happy, . . . thriving, . . . bonded with us . . . . [and] he gets to be a normal child and in a loving, stable home." *Id.* at 88.

[19] The CASA testified that, based on her "consistent positive [drug] tests, her criminal activity" and lack of engagement or progress, allowing Mother to have an ongoing relationship with the children would put their safety at risk. *Id.* at 95.

[20] Mother testified that she was sober at the termination hearing dating back to her September 2017 incarceration for failing a drug test and testing positive for methamphetamine. Tr. Vol. II p. 12. She asked for additional time to receive services, demonstrate improvement, and to work toward reunification. She admitted that she was arrested during the pendency; that she used drugs in jail, but that she had remained sober for "a little bit over a month" at the time of the

termination hearing. *Id.* at 125. On November 8, 2017, the trial court entered its order terminating Mother's parental rights. App. Vol. II pp. 86. As to each child, the trial court found, among other things:

23.) * * * * * a) . . .[M]other has not participated in services, visited with the child, or obtained or maintained sobriety;

b) The child's mother has failed to establish or maintain a relationship with the child since the opening of the related CHINS proceedings in this county for the child, which has been a period of 20 months;

c) None of the conditions resulting in the child's removal from the parents' home and care have been remedied or even addressed by the child's mother;

d) Mother's criminal dealings, including her associations with dangerous criminals, pose a threat to the child's safety and wellbeing;

e) Mother has stated that she wants to reunify with her children, but she has made no efforts to make that happen. Her actions speak louder than her words, and she continues to act only out of self-interest, to the determent [sic] of her child;

24.) . . . [T]here is a reasonable probability that the continuation of the parent-child relationship between the biological mother and child poses a threat to the well-being of the child, and also that there is a reasonable probability that the conditions that resulted in the child's removal from and continued placement outside the care and custody of the biological mother will not be remedied.

25.) The child has been removed from the home and care of the biological parents since January of 2016, a time period of approximately twenty (20) consecutive months through the date of the completion of the termination trial. The child has resided with his current pre-adoptive relative family since January of 2016, a time period of approximately twenty (20) months at the close of the termination trial. The child knows this family as his own and expresses the desire and intention to remain in this home permanently as a member of that family. The child has positively responded to the stability and structure, as well as the love and nurturing, provided by this family, which was previously entirely lacking in his life.

26.) The child's DCS case managers, CASA, therapist, and relative caregiver have all testified that termination of the parent—child relationship and adoption of the child are in the child's best interests. The Court agrees with these opinions, and now accepts and adopts them as its own finding of fact in these proceedings.

27.) The description of the care, love, and attention given to the child by the relative caregivers, as well as the opinions cited above, also demonstrate that adoption is a satisfactory plan for the care and treatment of the child, which is now also found as fact for purposes of these termination proceedings.

*Id*. at 18. Mother now appeals.

# Analysis

Mother challenges the sufficiency of the evidence supporting termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in

the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children,* 796 N.E.2d 280, 285 (Ind. 2003)). We recognize that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*). Courts need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship*. Castro v. State Office of Family & Children,* 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied*. "Rather, when the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *Id.*

[22] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re I.A.,* 934 N.E.2d at 1132. We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions

thereon in granting DCS's petition to terminate Mother's parental rights, as required by Indiana Code Section 31-35-2-8(c). *See In re N.G.,* 61 N.E.3d 1263, 1265 (Ind. Ct. App. 2016). When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *In re I.A.,* 934 N.E.2d at 1132. We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[23] Indiana Code Section 31-35-2-8(a) provides that, "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the wellbeing of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1234 (Ind. 1992).

[24] Mother contends there is insufficient evidence that there is a reasonable probability the conditions leading to the children's removal from her care would not be remedied.[5] In order to prove this element, DCS must establish (1) what conditions led to DCS placing and retaining the children in foster care; and (2) whether there is a reasonable probability that those conditions will not be remedied. *I.A.,* 934 N.E.2d at 1134. When analyzing this issue, courts may consider not only the basis for the initial removal of the children, but also reasons for the continued placement of the children outside the home thereafter. *In re A.I.,* 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied.* Courts must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed circumstances. *A.D.S. v.*

---

[5] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We conclude there is sufficient evidence of a reasonable probability that the conditions resulting in the children's removal from Mother's care would not be remedied, and we need not address whether there is sufficient evidence that continuation of the parent-child relationship posed a threat to C.B. and Ca.B. *See A.D.S.,* 987 N.E.2d at 1158 n.6.

*Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied.* The parent's habitual patterns of conduct should be evaluated to determine the probability of future neglect or deprivation of the child. *Id.* Factors to consider include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Courts also may consider services offered to the parent by DCS and the parent's responses to those services. *Id.* DCS is not required to prove a parent has no possibility of changing; it need only establish a reasonable probability that no change will occur. *Id.*

[25] Here, DCS removed the children because of Mother's substance abuse and resulting inability to meet their basic, educational, and emotional needs. Mother's house smelled of methamphetamine. Her addiction was so acute that she locked herself in the bathroom for hours to use methamphetamine and would eventually emerge only to remain in a stupor for hours. During the twenty-month long CHINS pendency, Mother did not make any progress toward achieving sobriety. Mother failed to submit to drug screens as asked. She lied under oath when she testified that she had not used illegal substances since July 2017. She was arrested during the pendency for dealing in methamphetamine and pled guilty to assisting a criminal in violation of the court's orders that she abstain from possessing or using drugs. She failed to complete her court-ordered substance abuse assessment and was unsuccessfully discharged for noncompliance. Lastly, Mother lied to DCS about her enrollment in intensive outpatient classes for her substance abuse. Although

Mother asked on multiple occasions for services to be resumed, DCS family case manager McCarty testified that she failed to give a consistent string of negative drug screens, so DCS doubted her willingness and her ability to engaged in those services given that "[Mother] was not clean and sober during the summer[.]" Tr. Vol. II p. 111.

[26] Mother's addiction adversely affected the children in significant ways. Child therapist Vandenburgh testified that C.B. was "sad," "distraught," "angry," and "hungry." *Id*. at 54. He had a compromised immune system, was diagnosed with ADHD, PTSD, anxiety, behavioral problems, and obsessed about food availability because he and Ca.B frequently went unfed. Mother's inability to properly parent and provide for the children prompted then-six-year-old C.B., who understood that Mother was abusing drugs, to assume a parental posture and to feel responsible for caring for, feeding, and even forgoing meals to ensure that Ca.B had food to eat. He frequently missed or was late to school and failed to complete his homework. C.B. had violent ideations and mixed emotions regarding Mother. Ca.B., on the other hand, was underweight, developmentally-delayed, had dietary issues, and was not functioning normally. The trial court heard considerable testimony regarding the "trauma" that the children suffered due to Mother's lack of supervision, inattention, and neglect. *Id*. In sum, there is clear and convincing evidence that Mother's substance abuse led to the children's removal from Mother's care and that there was a reasonable probability—given her complacency and failure to engage in *any* related services—that the condition could not be remedied.

[27] Mother also asserts that DCS failed to prove that termination of her parental rights was in the children's best interests. "A parent's historical inability to provide adequate housing, stability, and supervision, coupled with a current inability to provide the same, will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro*, 842 N.E.2d at 374. The testimony of a child's guardian ad litem or special advocate or professional caseworkers also can be evidence that termination is in a child's best interests. *McBride v. Monroe County Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). Both factors are present here: Mother's inability to maintain sobriety, along with testimony from the CASA and the DCS case managers opining that termination was in the children's best interests.[6]

## Conclusion

[28] There is sufficient evidence to support the termination of Mother's parental rights to her children. We affirm.

[29] Affirmed.

[30] Vaidik, C.J., and Pyle, J., concur.

---

[6] We do not reach Mother's contention that DCS failed to make reasonable efforts to reunify or preserve her family as this is not among the Indiana Code Section 31-35-2-4(b)(2) statutory factors.