## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2020, 8:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Andrew R. Bernlohr
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.C., Mother, and M.H. and M.H., Jr., Minor Children,

J.C.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

January 31, 2020

Court of Appeals Case No. 18A-JT-3147

Appeal from the
Marion Superior Court

The Honorable
Marilyn A. Moores, Judge
The Honorable
Scott Stowers, Magistrate

Trial Court Cause Nos.
49D09-1807-JT-854
49D09-1807-JT-855

**Kirsch, Judge.**

[1] J.C. ("Mother") appeals the termination of her parental rights to her two minor children. On appeal, Mother raises the following restated issue: whether the default judgment to terminate Mother's rights should be set aside because the Indiana Department of Child Services ("DCS") did not provide Mother with notice ten days before the termination as required by statute.

[2] We affirm.

## Facts and Procedural History

[3] The facts most favorable to the judgment are as follows. Mother is the biological parent of M.H. and M.H., Jr. ("Children"), who were born on September 27, 2010 and January 19, 2013, respectively.[1] On September 6, 2016, DCS filed a verified petition alleging that each of the Children was a child in need of services ("CHINS"). Specifically, the CHINS petition alleged that Children were victims of abuse or neglect, based on, among other things, Mother's failure to provide Children with an "appropriate living environment free from sexual abuse." *Appellant's Ex. Vol. I* at 15.[2] Mother appeared for a September 7, 2016 hearing, and notwithstanding Mother's denial of the CHINS

---

[1] On December 18, 2018, Children's father executed a consent for Children to be adopted. *Appellant's App. Vol. II* at 91, 92. The CHINS court dismissed father from the termination action, and he is not part of the instant appeal. *Id.* at 93-96. Therefore, we focus on the facts pertaining to the termination of Mother's parental rights.

[2] The exhibit volume is sequentially paginated; therefore, we omit the exhibit numbers and cite only to the page numbers.

allegations, the CHINS court found sufficient evidence to order Children removed from Mother's care and custody.

[4] Mother appeared at an October 18, 2016 hearing, and Children were adjudicated CHINS upon Mother's admission. During that hearing, the CHINS court heard evidence that Mother completed a parenting assessment, Mother was engaged with Children during parenting time sessions, and her visitation facilitator had no concerns during visits. That same day, the CHINS court issued a dispositional order and a parent participation order, directing Mother to participate in reunification services, including home-based case management, home-based therapy, and a parenting assessment.

[5] Mother attended a periodic review hearing on January 24, 2017,[3] during which the DCS family case manager ("FCM") reported that Mother was doing well in all of her services, had completed her parenting assessment, had an appointment for a clinical assessment, and was engaged in parenting time. The FCM recommended that Mother complete a domestic violence and psychological assessment. The guardian ad litem, Mary Goodwin ("GAL"), reported that Children were doing well in their placement. The GAL, however, was concerned that Children were hesitant about seeing Mother. The CHINS

---

[3] To understand the proceedings that led to termination of Mother's rights, we used Mother's Quest number to search within the CMS system, located within the Indiana Court Information Technology Extranet (INcite).

court ordered that Children remain in placement but kept reunification as the permanency plan.

[6] Mother and Jackie Leigh Butler ("Butler"), Mother's public defender, attended a May 16, 2017 periodic review hearing. The FCM and GAL reported that Children were engaged in therapy and doing well in their placement. Mother, too, was engaged in therapy. The FCM reported that even though there had been discussions with Mother about inconsistency with parenting time, Mother had missed parenting time sessions subsequent to those conversations. Mother tried to complete a clinical evaluation through her own provider but was unsuccessful; DCS had to make a referral. Mother was participating in domestic violence treatment through her home-based therapist, specifically, Mother was working on accepting that M.H. had been sexually abused. The CHINS court determined that Children should remain outside Mother's care but kept reunification as the permanency plan. DCS increased Mother's parenting time and allowed Children's maternal grandmother to be present for some of those visits.

[7] Mother and Butler were present at the August 29, 2017 permanency hearing, at which DCS asked that reunification remain the permanency plan. The FCM testified that Mother was engaged in services and had completed a clinical interview but said further treatment was recommended. Mother was re-referred to home-based case management. DCS was concerned that Mother was (1) inconsistent with parenting time and (2) still denying that M.H. had been sexually abused. The FCM reported that Children were doing well in

placement yet noted that Children had some concerning behaviors that were being addressed in therapy. The visitation facilitator expressed concern that Mother had cancelled eighteen parenting time sessions. The plan remained reunification, and the CHINS court set a hearing for December 12, 2017, which was the projected reunification date.

[8]     Mother and Butler were also present at the December 12, 2017 permanency hearing, during which the FCM reported that Mother had completed domestic violence treatment. DCS requested that Mother participate in home-based therapy through a DCS provider because DCS had been unable to obtain records from Mother's private therapist. DCS also requested that Mother complete treatment for non-offending parents of children who have been sexually abused. The GAL reported that Children were doing well in placement. The FCM and GAL agreed that the permanency plan should remain reunification. Mother said that her parenting time was going well and asked DCS to assist with a safety plan. Butler reported that Mother is engaged in therapy and shared Mother's concern that Children have not been in therapy for more than three months. Butler asked that Children be placed with Mother. DCS objected to such placement. The CHINS court: (1) denied Mother's request for placement; (2) kept reunification as the permanency plan; (3) denied Mother's request for increased parenting time; and (4) limited maternal grandmother to attending just twenty-five percent of Mother's parenting time sessions, to better assess Mother's relationship with Children. DCS was ordered to hold a child and family team meeting before mid-January 2018.

Mother and Butler appeared at the March 20, 2018 CHINS periodic review hearing. DCS requested continued wardship over Children and asked the court to set a permanency hearing. The GAL noted concerns about Children's previous placement, concerns that she had communicated with DCS. Newly appointed DCS family case manager Karon Donaldson ("FCM Donaldson") reported: (1) Children were predominantly doing well in placement; (2) Mother's providers, including her home-based therapist, noted Mother's contact had decreased and asked that Mother's case be closed as unsuccessful; (3) Mother's home-based case management was closed as unsuccessful but Mother had been re-referred; (4) DCS was investigating alternate placement in relative or kinship care; and (5) DCS had been unable to schedule a child and family team meeting due to Mother's absence. A Unified Solutions therapist said she had worked with Mother for eight months but was planning to discharge her as unsuccessful. Butler asked that Children be placed with their godmother.[4] Following the hearing, the CHINS court concluded that the reasons for Children's removal had not been remedied. The court (1) agreed that DCS could refer Mother to all appropriate services; and (2) ordered DCS to make necessary arrangements for Mother's parenting. Children were moved to a new placement in May 2018.

---

[4] Children were later placed with their godmother in pre-adoptive placement. In December 2018 Children's father consented to the termination of his parental rights so that the godmother could adopt Children.

Butler appeared without Mother at the June 19, 2018 permanency hearing. DCS reported that Mother had not engaged in services and had not visited the Children since March 2018. *Appellant's Ex. Vol. I* at 37. In fact, Mother had specifically "refused to engage with DCS providers" and had "declined" to visit Children. *Id*. at 37, 38. The CHINS court found that Mother had "therapeutic goals to reach" before she would be "in a position to appropriately care for the [C]hildren and meet their physical and emotional needs." *Id*. at 38. Mother, however, was not willing "to engage in the services to reach those therapeutic goals." *Id*. The GAL reported that Children were doing well in current placement and asked that the plan change to adoption. *Id*. The CHINS court changed the permanency plan "from reunification to adoption." *Id*. at 39.

FCM Donaldson sent Mother an email on June 20, 2018, saying:

> Let me know when you would like to come and pick up your court report and the court order, it is too many papers to scan.
>
> The *plan did change to adoption* and your *parenting time has been suspended* until you have participated in services for no less than 30 days and the recommendation of all providers, GAL and DCS.

*Motion to Proceed in Forma Pauperis*, *Ex.* 1 (emphasis added). On June 21, 2018, Mother replied on the same email chain, saying:

> Since you are unable to scan, send documents to me via mail.
>
> P.O. Box ["2"]
> Indianapolis, Indiana

Have a Good Day

*Id*. Post Office Box "2" was assigned to Mother through the Indiana Attorney General Office's Address Confidentiality Program ("ACP").[5] *Motion to Proceed in Forma Pauperis*, *Ex.* 2. "The ACP is a free program that allows victims of domestic violence, sexual assault, or stalking who have protective orders to maintain a confidential address through the Attorney General's Office." https://www.in.gov/attorneygeneral/3093.htm (last visited Jan. 13, 2020). Mother had a protective order against Children's father.

[12] On July 16, 2018, DCS filed a verified petition for involuntary termination of parental rights ("TPR") as to Mother. DCS alleged, in pertinent part, that (1) there is a reasonable probability that the conditions that resulted in Children's removal or reason for placement outside the home would not be remedied or (2) there was a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of Children. The juvenile court prepared a TPR Summons and Notice of Hearing and Notice of Possible Default Judgment on July 18, 2018. That notice informed Mother:

> **YOU ARE HEREBY NOTIFIED** that a Petition for the Involuntary Termination of Parental Rights of the above name[d]

---

[5] We do not use the actual box numbers. Mother was initially assigned P.O. Box "1," which was the address contained in the juvenile court's records. However, during the time period when the TPR proceedings were ongoing, the mail addressed to P.O. Box "1" was automatically forwarded to P.O Box "2." *Motion to Proceed in Forma Pauperis*, *Ex.* 2.

children, a copy of which is attached hereto, has been filed in the above-named Court.

**YOU ARE HEREBY NOTIFIED AND COMMANDED TO APPEAR** before the Judge of the Marion Superior Court, 2451 N. Keystone Avenue, Indianapolis, IN 46218, 317-327-8392 for a(n) Initial Hearing on **7/27/2018 at 1:30 PM in JUVENILE COURT ROOM 02 4th Floor** on the petition for termination of parental rights.

**YOU ARE FURTHER NOTIFIED** that if the allegations of the petition are found to be true and/or you fail to appear at the hearings, the Court may terminate the parent-child relationship; and if the Court terminates the parent-child relationship, you will lose all parental rights, powers, privileges, immunities, duties, obligations including any rights to custody, control, visitation, or support of the child; and if the Court terminates your parent-child relationship, it will be permanently terminated, and thereafter you may not contest an adoption or other placement of said children, and

**YOU ARE ENTITLED TO REPRESENTATION BY AN ATTORNEY**, provided by the State if necessary, throughout these proceedings to terminate the parent-child relationship.

**If this SUMMONS is duly served upon you and you fail to appear for the INITIAL and/or FACT-FINDING HEARING, adjudication on said petition and termination of your parental rights may be entered against you without further notice.**

*Id*. at 41 (emphasis in original). A process server went to Mother's last known address to serve notice on July 21, July 24, July 25, and July 27, 2018. *Id*. at 47, 59. Three of those times, she left a card, and twice she called the complex

office, trying to confirm Mother's residency. *Id.* Unsuccessful, the process server executed an Affidavit of Non-Service on July 27, 2018. The CHINS court sent a copy of the notice to P.O. Box "1." *Id*. at 38. Mail addressed to P.O. Box "1" was automatically forwarded to P.O. Box "2," the address Mother, via email, told FCM Donaldson to use. *Motion to Proceed in Forma Pauperis*, *Exs.* 1, 2.

[13] Mother did not appear at the July 27, 2018 TPR initial review hearing, and the juvenile court set the matter for a continued initial hearing on August 17, 2018. *Appellant's App. Vol. II* at 52, 53. On or about July 30, 2018, FCM Donaldson filed an "Affidavit of Diligent Inquiry," affirming that Mother had reported no change of address to the Management Gateway for Indiana Kids ("MaGIK") database. *Appellant's Ex. Vol. I* at 12. The affidavit notified the juvenile court that DCS's efforts to notify Mother of the upcoming TPR hearings had been unsuccessful. *Id.* FCM Donaldson stated that, under her instruction, DCS had: (1) attempted to serve notice on Mother at her last known addresses; (2) sent Mother emails; (3) called Mother at various numbers; and (4) searched for Mother in the databases of MaGIK, Indiana Bureau of Motor Vehicles, Indiana Department of Correction and its offender database, Federal Bureau of Prisons and its offender database, and the White Pages. *Appellant's Ex. Vol. I* at 12. FCM Donaldson also checked the county jail. *Tr. Vol. I* at 8.

[14] When Mother did not appear at the August 17, 2018 continuation of the initial hearing, the juvenile court granted DCS's request for a default date as to Mother and set that hearing for November 21, 2018. In its August 17, 2018

order, under the heading "Advisement of Rights," the juvenile court noted, "Mother not present, sets for Default." *Id*. at 60. Under the title, "Next Hearing," the juvenile court stated, "The Court now sets a(n) Continued Initial Hearing on 9/7/2018 at 1:30 PM in Court #2 and Default Hearing on 11/21/2018 at 9:00 AM in Court #2. The parties, their assigned or appointed counsel, and the assigned DCS [FCM] are ordered to appear at the hearing without further notice." *Id*. at 61. As evidenced by the notation "Copied:" at the bottom of the order, the juvenile court sent a copy of that order to Mother at P.O. Box "1," which at that time automatically forwarded mail to Mother's stated address of P.O. Box "2." *Id*.

[15]    Unable to reach Mother by other means, DCS sought the court's permission to publish notice, and on August 28, 2018, the juvenile court "enter[ed] an order authorizing Summons by Publication on [Mother]." *Id*. at 21. Notice was published in The Indianapolis Star three times, August 31, 2018, September 7, 2018, and September 14, 2018. *Appellant's Ex. Vol. I* at 8. The notice included the date, time, and location of the TPR hearing, as well as a phone number to call. *Id*. at 6.

[16]    Mother was not present at the November 21, 2018 default hearing where FCM Donaldson was the sole witness. She testified that Children were removed from Mother's care in September 2016 under allegations that Children were CHINS because Mother "failed to provide [C]hildren a safe, stable, and appropriate living environment free from sexual abuse, and that [M.H.] had been touched in an inappropriate and sexual manner by . . . mother's paramour, without

necessary action from [Mother], and that [Mother] has a history of mental health issues." *Tr. Vol. II* at 6. On October 18, 2016, Children were adjudicated CHINS based on Mother's admission. *Id.* That same date, the CHINS court entered a dispositional order requiring Mother to participate in and follow recommendations of home-based therapy, home-based case management, a parenting assessment, and a clinical evaluation. *Id.*

[17] FCM Donaldson, who had been with the case for about a year, stated that Mother initially participated, with some exceptions, in home-based case management and home-based therapy. *Id.* at 6-7. Mother also participated in supervised parenting time. *Id.* As time progressed, Mother stopped participating and her supervised visits became "very inconsistent." *Id.* at 7. FCM Donaldson testified that, because Mother had made insufficient progress, she could not recommend an increase in supervised parenting time. *Id.*

[18] FCM Donaldson confirmed that the permanency plan changed to adoption. DCS filed a TPR petition on July 16, 2018; by then Children had been removed from Mother's care for more than six months. *Id.* FCM Donaldson testified that, if Mother's parental rights were terminated, DCS's plan for the care and treatment of Children was adoption. *Id.* at 8. FCM Donaldson testified that she had visited Children who were "doing very well" in pre-adoptive placement; they were doing very well at home and in school. Saying it was in Children's best interest to have Mother's parental rights terminated, FCM Donaldson testified that Children are bonded and "their daily medical, dental, and eye, and things like that are maintained, um, and they are happy." *Id.*

DCS had no concerns about Children's safety. FCM Donaldson informed the juvenile court about the various attempts it had made to inform Mother of the hearings to terminate her parental rights. No evidence was presented on Mother's behalf.

[19] On November 21, 2018, the juvenile court entered both a default judgment and a separate order granting DCS's petition as follows:

> Upon evidence presented, the Court now finds by clear and convincing evidence:
>
> 1. Efforts of diligent inquiry have been made to ascertain the whereabouts of [Mother], to no avail, and service by publication is the most reasonable form of service in this matter.
>
> 2. Notice was published, pursuant to Indiana Trial Rule 4.13, on [Mother] three consecutive weeks and last being made on September 14, 2018, more than thirty (30) days before this trial date.
>
> 3. [Mother] is the mother of [M.H.] and [M.H., Jr.], both minor children.
>
> 4. [M.H.] was born on September 27, 2010 and is presently eight (8) years old. [M.H., Jr.] was born on January 19, 2013 and is presently five (5) years o1d.
>
> 5. [M.H., Sr.] is the [C]hildren's father.
>
> 6. A Child in Need of Services ("CHINS") Petition was filed on the [C]hildren on September 6, 2016, under Cause Numbers 49D09-1609-JC-003363-[003364], following allegations that

[Mother] failed to provide the [C]hildren with a safe and appropriate living environment free from sexual abuse.

7. The [C]hildren were detained and ordered removed from [M]other's care and custody at the September 7, 2016 "Initial/Detention Hearing."

8. The [C]hildren were adjudicated to be CHINS as to [M]other on October 18, 2016, when she admitted to an amended CHINS allegation. Specifically, "[M.H.] has disclosed being touched in an inappropriate and sexual manner. The family will benefit from therapeutic services supplied by DCS. Therefore, Court intervention is necessary."

9. Also on October 18, 2016, the CHINS Court proceeded to disposition as to [Mother]. She was ordered to participate in Home Based Therapy; Home Based Case Management; Parenting Assessment; and to complete a Clinical Evaluation. The [C]hildren remained removed from [M]other's care and custody pursuant to the Dispositional Decree.

10. . . . . [Mother] . . . has only seen the [C]hildren one time since March 2018.

11. The [C]hildren had been removed from [M]other's care and custody for at least six (6) months under a dispositional decree prior to this Termination Action being filed on July 12, 2018.

12. There is a reasonable probability that the conditions that resulted in the [C]hildren's removal and continued placement outside of the home will not be remedied by [Mother]. Mother's whereabouts remain unknown as does her ability and willingness to parent. She has made no meaningful or sustainable progress toward reunification.

13.  The continuation of the parent-child relationship poses a threat to the [C]hildren's well-being in that it would serve as a barrier for them obtaining permanency through an adoption when [Mother] is unavailable to offer permanency and parent.

14.  Termination of the parent-child relationship is in the [C]hildren's best interests.  Termination would allow them to be adopted into a stable and permanent home where their needs will be safely met.

15.  There exists a satisfactory plan for the future care and treatment of the children, that being adoption.

16.  The [C]hildren ha[ve] been placed in "kinship" care since May 2018.  They are bonded and doing well.  This is a pre-adoptive placement.

17.  The Guardian ad Litem agrees with the permanency plan of adoption as being in the [C]hildren's best interests.

*Appellant's App. Vol. II* at 80-81.  Mother now appeals.

## Discussion and Decision

[20]  "We initially observe that our court has long had a highly deferential standard of review in cases concerning the termination of parental rights." *In re H.T.*, 911 N.E.2d 577, 579 (Ind. Ct. App. 2008).  "Accordingly, we will not set aside the juvenile court's judgment unless it is clearly erroneous." *Id*.  We do not reweigh the evidence or judge the credibility of the witnesses. *Id*.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id*.

[21]   The traditional right of a parent to establish a home and raise her children is protected by the Fourteenth Amendment to the United States Constitution. *In re S.S.*, 120 N.E.3d 605, 609 (Ind. Ct. App. 2019). Although parental rights are of a constitutional dimension, these rights are not absolute, and the law provides for the termination of parental rights when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* We subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Id.*

[22]   Mother argues that the juvenile court's default judgment terminating her parental rights to Children should be set aside because DCS failed to provide her notice as required by Indiana Code section 31-35-2-6.5. "Section 31-35-2-6.5 provides, in relevant part, that 'at least ten (10) days before a hearing on a petition or motion under this chapter ... the person or entity who filed the petition to terminate the parent-child relationship [here, DCS] . . . shall send notice of the review to . . . [t]he child's parent . . .'" *In re H.K.*, 971 N.E.2d 100, 102-03 (Ind. Ct. App. 2012). Mother argues that DCS took insufficient steps to locate her prior to the termination hearing. Specifically, she argues:

> DCS certainly did take some action to provide [Mother] with notice. [DCS] endeavored to find her through the BMV, all relevant detention facilities and attempted contact through her last known phone number and address. [DCS] then published notice in a newspaper of general circulation in the county of jurisdiction. . . .

> What stands out from the record are the ways that DCS did *not* attempt to find and provide notice to [Mother]. The [C]hildren were placed in kinship care, meaning they were placed with family of either [Mother] or [C]hildren's father. In either event, the most logical means of finding [Mother] would have been to check with her family. . . .
>
> The goal of DCS must be to actually find the person they are seeking. The goal cannot be to establish they did just enough to satisfy a court that notice was made in order to secure a default judgment.

*Appellant's Br.* at 7-8.

[23]    It is well-settled that the State must satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United State Constitution when it seeks to terminate a parent-child relationship.[6] *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Although due process has never been precisely defined, it requires "an opportunity to be heard, and an opportunity to confront witnesses." *In re M.L.K.,* 751 N.E.2d 293, 295-96 (Ind. Ct. App. 2001). "Thus, before an action affecting a party's interest can proceed, 'the State, at a minimum, must provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their

---

[6] In her motion to show cause and request for appointed counsel, filed April 5, 2019, Mother, acting pro se, contends that the juvenile court denied her due process.

objections.'" *In re H.T.*, 911 N.E.2d at 579 (quoting *In re M.L.K.*, 751 N.E.2d at 296).

[24] Indiana Trial Rule 4.1(A) allows service to be made upon an individual by leaving a copy of the summons at the dwelling house or usual place of abode; however, such form of service must be followed-up by a summons, sent by first class mail to the last known address of the person being served. Ind. Trial Rule 4.1(B).[7] Here, DCS filed its TPR petition on July 16, 2018 and drafted the summons and notice on July 18. The notice set out the time and place of the initial hearing, the court's phone number, and informed Mother that failure to appear could result in termination of her parental rights without further notice. *Appellant's App. Vol. II* at 41. A process server went to Mother's last known address and tried to make service on July 21, 24, 25, and 27. *Id*. at 47, 59. The process server left a card three times and twice called the complex office trying to confirm Mother's residency. *Id*. The process server executed an Affidavit of Non-Service on July 27, 2018. A copy of the notice was also sent to the P.O.

---

[7] Our court has previously held that notice of a hearing pursuant to Indiana Code section 31-35-2-6.5 does not require compliance with Trial Rule 4, which governs service of process and incorporates a jurisdictional component. *In re C.C.*, 788 N.E.2d 847, 851 (Ind. Ct. App. 2003), *trans. denied*. Rather, in order to comply with Indiana Code section 31-35-2-6.5, a party need only meet the requirements of Indiana Trial Rule 5, which governs service of subsequent papers and pleadings in the action. *Id.* We note that Mother cites to neither trial rule in her brief. However, because we understand Mother's argument to be a complaint about the propriety of the original service of summons, we, like the juvenile court, analyze Mother's claim under a Trial Rule 4 analysis. *See In re J.H.*, 898 N.E.2d 1265, 1269 (Ind. Ct. App. 2009) (analysis under Trial Rule 4 when claim is direct challenge to the service of process), *trans. denied*.

Box that Mother had given FCM Donaldson . *Id*. at 38.  Mother did not appear at the July 27 hearing.

[25]  Meanwhile, having received no contact from Mother, FCM Donaldson filed an affidavit of diligent inquiry affirming, under penalty of perjury, that Mother could not be found and had not reported a change of address to the MaGIK database. *Appellant's Ex. Vol. I* at 12.  FCM Donaldson affirmed that, at her instruction, DCS had:  (1) attempted to serve notice on Mother at her last known address; (2) sent Mother emails; (3) called Mother; and (4) searched for Mother in the databases of MaGIK, Indiana Bureau of Motor Vehicles, Indiana Department of Correction and offender database, Federal Bureau of Prisons and offender database, and the White Pages. *Id.*  FCM Donaldson also checked with the county jail.  *Tr. Vol. I* at 8.

[26]  When the person to be served cannot be found a "summons may be served in the manner provided by Rule 4.9 (summons in in rem actions)."  Ind. Trial Rule 4.5; *see In re J.H.*, 898 N.E.2d 1265, 1268 (Ind. Ct. App. 2009) ("A proceeding to terminate parental rights is basically an in rem proceeding and is governed by the Indiana Rules of Procedure."), *trans. denied*.  Trial Rule 4.9 allows service of summons to be made by publication pursuant to Indiana Trial Rule 4.13.  Indiana Trial Rule 4.13 provides that when notice by publication is to be used, the person or entity seeking such service by publication "shall submit [the] request therefor upon the praecipe for summons along with supporting affidavits that diligent search has been made [and] that the [party] cannot be found . . ., and shall prepare the contents of the summons to be

published." Service should be made, however, in the best possible manner reasonably calculated to inform the respondent of the pending action. *In re A.C.*, 770 N.E.2d 947, 949 (Ind. Ct. App. 2002).

[27] Unable to reach Mother by other means, DCS sought permission to publish notice, and on August 28, 2018, the juvenile court "enter[ed] an order authorizing Summons by Publication on [Mother]." *Appellant's App. Vol. II* at 21. Notice was published in The Indianapolis Star three times, August 31, 2018, September 7, 2018, and September 14, 2018. *Appellant's Ex. Vol. I* at 8. The published notice included the date, time, and location of the TPR hearing, as well as a phone number to call. *Id*. at 6. Mother does not complain about the content of the publication; instead, she argues that DCS did not do enough to find her. We disagree. Here, DCS sent Mother notice at all the addresses it had, including the last address provided by Mother. Through FCM Donaldson's email, Mother knew that the plan had changed to adoption and yet took no action. DCS attempted to contact Mother by personal service, leaving notes and attempting to confirm Mother's residency with the complex. FCM Donaldson called and emailed Mother without response. Under the facts of this case, we find that DCS complied with the Indiana Trial Rules regarding service and its attempted service comported with the Due Process Clause of the Fourteenth Amendment.

[28] We note Mother's frustration that appointed appellate counsel appealed only the issue of notice and did not contest any of the juvenile court's underlying

findings of facts or conclusions.[8]  Had counsel done so, the result would be the same.  To terminate Mother's parental rights, DCS had to prove by clear and convincing evidence:  (1) Children were removed from Mother's care for at least six months; (2) there is a reasonable probability that the conditions that resulted in Children's removal would not be changed; (3) the termination of Mother's parental rights is in the Children's best interest; and (4) there exists a satisfactory plan for the Children's care and treatment.  Ind. Code § 31-35-2-4(b)(2).  The parties agree that Children have been out of Mother's care for more than six months.

[29]  The Children were removed from Mother's care based on an allegation of Mother's failure to provide Children with an appropriate living environment free from sexual abuse.  At the time of the termination hearing, Mother had stopped participating in services and her supervised visits became "very inconsistent."  *Tr. Vol. II* at 7.  FCM Donaldson testified that Mother "ha[d] not demonstrated her desire, nor her ability as a parent, to provide a safe home and environment for her children, and to keep them safe from any sexual abuse, . . . [and] she has not made herself available, . . . she's not willing to provide that continued care."  *Id*. at 9.  Based on the facts before the court, the juvenile

---

[8] Mother expressed her concern in her request to Withdraw Appointed Counsel, which was received by our court on September 17, 2019.  While it is unclear whether this document was filed with the court, because the termination of parental rights is such a serious matter, we briefly address Mother's concerns.

court's conclusion that conditions that resulted in Children's removal would not be remedied was not clearly erroneous.

[30] To determine the best interests of children, our court is required to look beyond the factors identified by the department of child services and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the trial court must subordinate the interests of the parents to those of the children. *Id.* The juvenile court "need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014). By the time of the TPR fact-finding hearing, Mother had refused to participate in services and had stopped going to parenting time sessions. The GAL, by affidavit, and FCM Donaldson, during the TPR fact-finding hearing, testified that it was in the best interest of Children for Mother's parental rights to be terminated. *Appellant's Ex. Vol. I* at 4; *Tr. Vol. II* at 9. Our court "has previously determined that the testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests." *McBride*, 798 N.E.2d at 203.

[31] Finally, DCS proposed a permanency plan that Children be adopted by their godmother, a person liked by both Mother and Children's father. The juvenile court's finding that DCS has a suitable plan for Children care and treatment is not clearly erroneous. *See In re D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004) (permanency "plan need not be detailed, so long as it offers a general sense of

the direction in which the child will be going after the parent-child relationship is terminated"), *trans. denied*.

[32] Concluding that DCS adequately complied with the requirements to provide proper notice to Mother and finding that the outcome would have been the same even if Mother had been present, we affirm the termination of her parental rights to Children.

[33] Affirmed.

Bailey, J., and Mathias, J., concur.